**CAPRI OPTICS PROFIT SHARING,**
**Plaintiff, Appellant,**

v.

**DIGITAL EQUIPMENT**
**CORPORATION, Defendant, Appellee.**

**No. 91–1385.**

United States Court of Appeals,
First Circuit.

Heard Sept. 6, 1991.

Decided Nov. 18, 1991.

Joseph H. Weiss with whom Law Offices of Joseph H. Weiss, New York City, Law Offices of Robert A. Stolzberg, Boston, Mass., and Stull, Stull & Brody, New York City, were on brief, for plaintiff, appellant.

Edmund C. Case with whom Wayne M. Carlin, David C. Berry and Testa, Hurwitz & Thibeault, Boston, Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Circuit Judge, ALDRICH, Senior Circuit Judge, and SELYA, Circuit Judge.

BAILEY ALDRICH, Senior Circuit Judge.

The question in this class action is whether the body of stockholders in defendant Digital Equipment Corporation[1] are to

---

1. Claims against 14 individual Digital officers were dismissed, from which plaintiff does not appeal.

compensate those who bought on the market following alleged misrepresentations by management, and whose stock subsequently lost market value. The district court granted summary judgment for defendant, *Capri Optics Profit Sharing v. Digital Equipment Corp.*, 760 F.Supp. 227 (D.Mass.1991), and plaintiff, representing the complaining stock purchasers, appeals. We affirm.

This is a coats-off dispute, defendant charging plaintiff with "unconscionable miscitations and distortions of the record," and plaintiff asserting that the court completely misunderstood its case, and "viscerated Section 10(b)" of the Securities Exchange Act, 15 U.S.C. § 78j(b). To the court's conclusion that it could not support a finding that defendant's statements were "incomplete and inaccurate absent disclosure of the internal corporate events," citing *Backman v. Polaroid, post,* plaintiff says that this was not its contention at all; rather, the statements were false in themselves. At oral argument plaintiff put it, "[W]e never once, never once uttered the word nondisclosure. Continually misrepresentation."

This statement of its claim was not a momentary inadvertence.[2] Plaintiff's brief, even more fully, says that it "never once argued ... a duty to disclose any additional information." "The complaint ... does not complain that Digital had a duty to make additional disclosure or that Digital failed to make required disclosure." This was said in September, 1991. The complaint, dated June, 1988, reads,

> 23. By means of the aforesaid misrepresentations and omissions defendants knowing (sic) ... artificially inflated the market price of Digital's stock....

> 41. By reason of the foregoing, the defendants, in violation of the Exchange Act, made material misstatements *and/or failed to disclose* to shareholders, *material adverse information which omissions were* at the time and in light of the circumstances under which they were made, *misleading. Plaintiff and the other members of the class* (not knowing of the omission of such information which was misleading), in reliance on such omissions and/or materially misleading statements and/or in reliance on the integrity of the market, *purchased securities at a (sic) prices which were artificially inflated by such omissions* thereby causing by such reliance damages to plaintiff and the other members of the class.

(Emphasis supplied.)

It is true that plaintiff's complaint "never once uttered the word nondisclosure." However, it uttered "failed to disclose," once, and "omission(s)" five times. If plaintiff had in mind some distinction between nondisclosure and omission it has forgotten it, as later in its main brief we find,

> The plaintiff here, both before and after this Court's opinion in *Backman,* repeatedly and consistently pleaded and argued that Digital violated Section 10(b) by reason of active affirmative misrepresentations and misleading statements. *There was no claim of omissions.*

(Emphasis supplied.)

We dwell on this not because plaintiff criticizes the district court for misunderstanding its case, and not because such apparent contradictions are troubling, but to make clear the ground rules. We cannot accept plaintiff's word that it did not originally complain of omissions, but we will take its word that it now rejects that scope of its complaint. We read the allegation in concluding paragraph 39, "statements ... indicating a continuation of its rapid growth in sales and earnings" as limited to statements that so state themselves, and as not including statements from which readers might build conclusions in the absence of further disclosures. In *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir.1990) (en banc), we held that there was no duty to disclose to market buyers information simply because it was material, or to amplify

---

2. "I spent a lot of time preparing for this argument, and, for the life of me, I still can't see what *Polaroid* has to do with this case. We've alleged misrepresentation. We have not alleged any nondisclosure."

what was said, unless the omitted matter caused what was said to be misleading. *Polaroid* came down before summary judgment, but well after the complaint. Whether or not it was what caused plaintiff herein to change its tack, we accept its position that it does not presently claim defendant had a duty to supply omitted matter in order to prevent possible misleading. As an illustration, if defendant reported, correctly, without more, "This is our eighth consecutive quarter in which our gross has increased," there was no duty to add, for the benefit of market buyers, "We are concerned about the next one." *Polaroid* recognized that if defendant's apprehension was of a disaster the rule might be different, but this exception is not before us.

Turning to the substance of plaintiff's brief, although it early speaks of "the affirmative pleading here that Digital made nine misleading misrepresentations," it groups them, unnumbered, in a short paragraph, and thereafter the brief is in large part a conglomeration of selections from the record not addressed to defendant's statements individually. This makes it peculiarly difficult to apply plaintiff's present disclaimer of omissions "of internal corporate affairs," or of what might be thought by investors to be additional material facts. Plaintiff's brief is replete with facts that in no way indicate falsity of the facts that defendant did disclose. We have a burden that should not be ours.

Defendant's fiscal year 1988 began in July, 1987, the first quarter (1Q88) ending September 26, 1987; 2Q88 ended December 26, 1987; and 3Q88, March 26, 1988. The landmark "Black Monday's" market crash occurred on October 19, 1987. Plaintiff's class is shareholders who purchased their stock between January 13 and March 18, 1988. The order of the nine alleged misstatements is chronological in defendant's brief, but different in the complaint, and different in the court's opinion. We number them chronologically. However, we will not treat them in that order. Defendant says, as to all, that they "were not forward-looking, but commented on past history." For convenience, we will consider first statements as to which this was a manifestly correct description.

■ Paragraph 16 of the complaint sets out statements 1 and 2 as follows.

16. In a report dated October 28, 1987, a week after "Black Monday," Digital was quoted in an Alex Brown & Sons analyst's report as stating that "overseas business remains strong, while orders for customers in the US accelerated."

Thus, allegedly a week after Black Monday, defendant announced it was unaffected thereby; indeed, things were better. The actual fact is, Alex Brown was quoting defendant's October 14, 1987 press release—five days prior to Black Monday. If it were not so serious it might be amusing to note that Brown misquoted the release and plaintiff misquoted both Brown and the release. The release said, "Overseas business remained firm." This was clearly past history that, as of October 14, was indisputably correct. So was the statement regarding US orders.

■ Continuing with October, we find plaintiff's first factual reference to the appendix to be substantively out of context.

Following the October 19, 1987 stock market crash, there was concern at Digital as to what impact the crash may have on the financial services industry and "a lot of concern on a broader base as well." (Quotes in original.) On checking the cite, we find plaintiff's counsel examining one Caldwell, a director of defendant and a member of the audit committee.

Q. (Mr. Weiss) Do you recall after October of '87 whether there was concern as to what impact the market crash may have on the financial services industry in general?

Mr. Case (counsel for defendant): You mean—

Mr. Weiss: Nothing to do with Digital. Unrelated to Digital.

A. Well, yes. Yes, there was a lot of concern about that subject. There was a lot of concern on a broader base as well.

It is impossible to read this answer, as expressed by the witness, other that as

responsive to the question, "Nothing to do with Digital," and as quoted in plaintiff's brief, other than as directly related to Digital. Plaintiff says this to us even though the record shows it had said this below and the falsity had been pointed out by defendant. Thus our introduction to plaintiff's case shows contradictory characterizations of its complaint; a significant misdating of a press release, and an out-and-out misrepresentation of the testimony.

The remaining seven statements were made on January 13 and 14, 1988.

■ 3. On January 13, 1988 *The Wall Street Journal* reported that defendant's manager of investor relations had said that defendant's second quarter report would be out that week, and defendant "hasn't given out any negative guidance to analysts." (Paragraph 17). This was true; it had given none. Defendant was under no duty to brief analysts, and it does not appear how its failure to do so could be turned into a misrepresentation. If there were negative factors this was, of course, a nondisclosure or omission, but plaintiff says it never claimed any.

■ 4. On January 14 *The Wall Street Journal* reported defendant's January 13 announcement of a 22 percent increase in second quarter net income (indisputably correct), and that this growth rate "indicates market share gains." (Paragraph 18). Justifying this opinion, defendant's president, Olsen, by affidavit stated that defendant's practice in this regard was largely to compare itself with IBM's performance, and that IBM had shown a gain of 6 percent.[3] The statistics are of record. Plaintiff's only complaint is that, on his deposition, Olsen had no present memory of doing the checking. This requires no comment.

We pause again. The first concluding paragraph of the complaint reads,

38. At the time the statements were made, as alleged in paragraphs 16–19, Digital knew, or recklessly disregarded the fact that it had no reasonable basis in fact to make the statements.

Yet these first four statements, as shown throughout a 1,300 page appendix, were indisputably true, and wholly true, not half true. What caused plaintiff's assertions? We can think that if it thought the law was the reverse of what we later said in *Polaroid*, these statements of fact, though true in themselves, might interest the public in receiving further material, to quote the district court, "disclosure of the internal corporate events between October, 1987, and January, 1988." And, in fact, the record is full of such information, obtained by plaintiff through extensive depositions.[4] The difficulty with that possible justification of the complaint, maintained until *Polaroid* foreclosed it, is found in counsel's statement at oral argument that *Polaroid's* rule limiting disclosure requirements was what he had always understood. On this basis we are left with the conclusion that recklessness as to these four statements was not in defendant's making them, but was in plaintiff's complaint.

Passing statements 5 and 6 for the moment, we proceed to two statements as to which plaintiff does attempt to show present falsity.

7. *Some of the industry sectors that performed particularly well in the quarter include … financial services.*

■ The undisputed evidence shows that 2Q88 order performance was 55% greater than 2Q87 in the investment segment; 31% in financial services as a whole, and 23% above U.S. industries as a whole. To this plaintiff says, "Digital in fact did quite poorly in that all-important [investment] sector after the stock market crash." This conclusion was based on projecting the pre-crash orders into the post-crash period, re-

---

**3.** Seemingly to counter them, in its reply brief plaintiff states that affidavits "prepared by counsel" "amount to nothing more than coaching a witness, a practice not permitted at the witness' deposition or at trial." We are not told on what experience counsel bases this opinion.

**4.** We note that the court regretted having been too liberal in its permission. 760 F.Supp. at 233 n. 21. We might add that plaintiff went fishing in total ignorance of the waters, which contributed to this remark.

sulting in a "shortfall." Defendant disputes plaintiff's formula, but it has factual merit. On Friday, January 8, a competitor, Tandem, stopped trading, to everyone's concern, giving, as a primary cause, a slowdown in financial services, particularly investment. Defendant commissioned employee Hughes to make a memorandum of the year to date, and this properly reassured it as to 2Q88.[5] It did not answer plaintiff's above-quoted assertion, and supported it to the extent that the investment industry was regarded as a "leading indicator." We do not consider, however, that plaintiff has made out a point. Defendant's published statement of financial services success referred to the quarter as a whole, as to which it was entirely correct. It was not misleading not to break it down into parts; nor was defendant obliged to make that further disclosure.

8. *Digital reiterated that it hasn't experienced order declines in the wake of the October stock market crash.*

▮ The short answer to this is that it was wholly true. 2Q88 was 25% ahead of 2Q87. Defendant's business had always been seasonal, and it was the practice to compare with the same quarter the year before as more significant than the immediately preceding quarter. Plaintiff, without evidentiary support, ignores this, and argues from the adjoining quarter without even noting the comparable one. In fact it goes so far as to say that one particularly bad week in itself produced a jury case, making no response to defendant's undisputed testimony that there are always great variations, individual as well as seasonal.

▮ Alternatively, plaintiff argues that certified orders ("certs") (as distinguished, e.g., from statements of intent) are cancelable. Defendant replies that it always uses orders for reference, and that certs are customarily used in the trade. Plaintiff's

complaint that in reporting orders defendant did not spell out for readers the distinction between orders and ultimate revenue falls well within *Polaroid*'s protection.

▮ In this posture plaintiff contends, at great length, that in 3Q88 orders fell off. This, to the limited extent true, is totally irrelevant to purely factual statements about 2Q88.

The other January 13 and 14 statements were,

5. *"Business overall is firm."*

6. *"[I]nternational business ... remains quite strong."*

9. *"We're well poised to go into [the third quarter.]"*

As to 5 and 6 it is defendant's turn to overstate its case. We will consider these statements in more detail later, but it cannot be that they "commented upon past history" and to no degree were "forward-looking." From an investor's standpoint, a business that is good today, but expects a bad tomorrow is not firm.[6] At the same time, expectation, prophesy, is a statement of opinion, not a guarantee, and the burden is on plaintiff to show intent to deceive. *S.E.C. v. MacDonald,* 699 F.2d 47, 50 (1st Cir.1983) (en banc).

We will consider separately present and future assertions. What contrary facts did defendant know or should it have known, as of the time? What should it have realized as to the future?

▮ 5A. "Business overall is firm [as of the moment.]" The correctness of this statement is apparent from the correctness of statements 4, 7, and 8. Plaintiff makes two contentions. In some small matters things were going less well. To this defendant replies that they were unimportant, and were more than offset by others. This is precisely what is meant by "overall." What mixed business does not operate unevenly? Secondly, plaintiff says that some budget expectations were not

---

5. Plaintiff's misquoting this memorandum is treated, *post,* under *Sanctions.*

6. "[R]emains" is not even past performance. President Olsen was asked, in connection with statement # 2, *ante,* "Do you see any difference

in your mind, between one document saying "business remains firm" and the other one saying "business remained firm?" He replied, "One is reporting history and one is saying what the state is at the time."

being met. This is perhaps the nub of the case. It is apparent from the record that defendant had been a company of constant and spectacular growth, an investor's paradise, according to someone. Such things do not last forever. In July, 1987 defendant set an optimistic 1988 budget, based on continued future gains. That it later [7] may have had concerns about these being achievable, did not mean that business was not firm. There is a difference between firmness and, plaintiff's universal charge (paragraph 39), "indicating a continuation of its rapid growth."

5B. "We expect presently to continue firm." All statements must be understood in the context in which they are made. Any investor knew in mid-January, 1988 that the effect of the market crash on the economy was possibly long-term, and likely not fully met. How long, and how serious was a matter of broad debate, and it was generally believed to be too soon to tell. Under these known circumstances the amount of prophesy to be implied in a statement of current firmness must be minimal.[8]

6. *[I]nternational business ... remains quite strong.*

■ Though no one discussed it, while the word "quite" may mean "absolutely," it also may carry a diminishing implication. "He did quite well in his math exam" does not mean absolutely well. "Quite strong" does not mean maximum. The futurity implication in "remains" we have already dealt with. In fact it is not this that plaintiff emphasizes in this instance; it claims the present was already weak. For this, following its usual practice, it points to a poor third week; viz., the week after defendant's statement. More pertinent, week 2 certs for Europe were 52% greater than 3Q87. The fact that the combined first and second week was only 30% greater and so

were labelled a "slow start," reflects only on the failure to meet the optimistic growth budget. Plaintiff is trying to claim indirectly what plaintiff unsuccessfully complained of in *Polaroid.*

9. *"We're well poised to go into [the third quarter]."*

■ Plaintiff would have it that this was a promise of a successful quarter, while defendant says that it is not forward-looking at all. We disagree with both. "Poised" is a present condition. "Well poised" means appropriate to the future. However, there is no necessary promise of future success. A diver positioned on the diving board is given points for his poise separate from the execution of the dive itself. At the same time the poise must relate to the dive that is to follow. Here defendant expressed caution as to the future, and stated its plans. Plaintiff has done nothing to show the plans were inadequate, or that defendant was reckless in its opinion.

*Sanctions*

We would stop here were it not for the fact that defendant asks for costs and attorneys' fees, and if its characterization of plaintiff's brief, earlier quoted, is correct, they should be granted. We do not include the frivolously-attacked statements 1, 2, and 3, because plaintiff did not pursue them here, and while we are concerned with the lack of merit of the balance of the complaint, what most seriously trouble us are misrepresentations of the record. We start with those already noted.

1. We have already commented upon attributing to defendant the concern of market-crash impact felt by others.

2. In its reply brief plaintiff stated,
[T]he internal Hughes Memoranda demonstrated that ... Digital in fact was experiencing a slow down in its order

---

7. Plaintiff's misdating these concerns is dealt with under *Sanctions.*

8. A good example of then-current thinking is found in the testimony of Charles E. Shue, a former vice-president of U.S. sales. In January and February, 1988 he had not found a market

crash effect on defendant's business, but he believed there might be one in the future because he was "in touch with the customers ... and everybody back then was surveying everybody." On such a belief, "remains firm" on January 14 is not a reckless statement.

rate, "particularly" in the "investment" sector.

In fact, Hughes was speaking of competitor Tandem. As to defendant he said,

> Financial Services being up 36% over a year ago.... 36% growth rate in the U.S. is healthy.

3. On a number of occasions plaintiff attributed to December 14, 1987, evidence relating to post-January 14, 1988. Plaintiff's reply brief commences as follows. (The numbering of the lines as herein transcribed is ours.)

> Here, the non-distorted, non-disputed documentory evidence and testimony of Digital's own witnesses shows that:
>
> ....
>
> (b) On December 14, 1987, Digital's Board was told not only that costs were rising faster than revenue (APP 0645; APP 0648), something which may have been budgeted for, but that "the gap between the rate of expense growth and the rate of revenue growth is larger than the budget. As a result operating profit margins are below budget" (APP 0650); projected product orders, product revenues, and service revenues had decreased (APP 0693–99); "revenue was not growing as fast as it had been expected" (APP 0796); and the revenue forecast for the year may have to be revised downward (*Id.*);
>
> (c) On December 23, 1987, there was a further expression of "the general concern that expectations are too high for the second half of FY 88" (APP 0654);

The manifest intended impression is that everything stated in paragraph (b) was "non-distorted, non-disputed" truth as of December 14. This meaning is confirmed by the use of the word "had" in line 11. It is conclusively asserted by the use of the word "further" in line 17. We comment, clause by clause.

A. (Line 4). Correct, except that "may have been" stands for "was in July".

B. (Lines 5–9). The quotation is from a single sheet, undated. If one reads it further, it contains 2Q88's "actual results," and could not have been in existence on December 14, 1987.

C. (Lines 9–11). App. 0693–99 show nothing. The minutes of December 14 show that projected product orders and revenue had decreased, but that service revenues had *increased*, so that projected profit remained the same.

D. (Lines 12–13). The very deposition page from which this quotation was taken shows that the witness (Everett) was speaking of March, not December.[9] Continuing with the reply brief,

> (d) In January 1988, ... when Digital affirmatively represented ... that it "hasn't experienced order declines in the wake of the stock market crash"
>
> . . . . .
>
> Digital knew that there was a "slowdown in the order rates" and accordingly it increased discounts and allowances to help stipulate (sic) the weak order rate (sic) (App. 0692).

The single sheet so quoted bears no date. It is entitled "February Forecast Comments," and contains information of events occurring "since January." The full clause, from which plaintiff omitted the last five words, is "slow-down in the order rates in the month of January." It is difficult to think of this as "non-distorted, non-disputed documentary evidence" of what defendant knew and did before January 13.

■ From the opening contradictions of its complaint to the mound of misrepresen-

---

**9.** Plaintiff made a similar misdating in its main brief.

tations in its reply brief we have never seen such a case of the meretricious posing as the meritorious. It is platitudinous to say that this wastes the time of the court and counsel, *SMS Data Products Gen. v. United States*, 900 F.2d 1553 (Fed.Cir. 1990), going to the point of violating ethical guidelines, *Optyl Eyewear Fashion Intern. v. Style Companies*, 760 F.2d 1045 (9th Cir.1985), and we have awarded costs and attorneys' fees for far less. *Thomas v. Digital, Equipment Corp.*, 880 F.2d 1486, 1491 (1st Cir.1989). The present case is so extreme that we award double costs plus full counsel fees and expenses from the filing of the appeal to date, plus the cost of determining and establishing same, chargeable, jointly and severally, to the named plaintiff and to counsel. We follow the method employed in *Foley v. City of Lowell, Massachusetts*, 948 F.2d 10 (1st Cir.1991). Defendant is directed to file a detailed application with the clerk of this court pursuant to 1st Cir.Loc.R. 39.2. Plaintiff shall file its response as therein provided, and we shall thereafter enter an appropriate order.

The judgment below is *affirmed.* We retain jurisdiction pending determination of costs, fees, and expenses on appeal.