Leonard J. PACHECO, individually and as Co–Trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco Trust, Jim Beebe, individually and as Co–Trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco, Tari Eastman, individually and as Co–Trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco Trust, Miguelangel Aponte-Rios, individually and as Co-trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco Trust, as Trustee of the Michael Pacheco Trust, Linda Pacheco, individually, and as Co–Trustee of the Mary T. Pacheco Trust, as Co-Trustee of the FE & Mary T. Pacheco Trust, as Trustee of the Michael Pacheco Trust, James A. Pacheco, individually and as Co–Trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco Trust, as Trustee of the Michael Pacheco Trust, John M. Pacheco, individually and as Co–Trustee of the Mary T. Pacheco Trust, as Co–Trustee of the FE & Mary T. Pacheco Trust, as Trustee of the Andrew Pacheco Trust, as Trustee of the Gina Lynn Young Trust, as Trustee of the Heather Pacheco Trust, as Trustee of the Thomas Pacheco Trust, Michael Resler, as Trustee of the Timothy Pacheco Trust, as Co–Trustee of the Danny Pacheco Trust, as Trustee of the Joseph B. Pacheco Trust, as Trustee of the Sarah Pacheco Trust, Joseph B. Pacheco, as Trustee of the Timothy Pacheco Trust, as Co–Trustee of the Danny Pacheco Trust, as Trustee of the Joseph B. Pacheco Trust, as Trustee of the Sarah Pacheco Trust, Roberta L. Pacheco, as Co–Trustee of the Danny Pacheco Trust, Laura Pacheco, individually and as Co–Trustee of the Margaret Donovan Trust, as Co–Trustee of the Buruka Trust, as Co–Trustee of the Bravo Trust, as Co–Trustee of the Crocodile Rock Trust, as Co–Trustee of the Inca Trust, as Co–Trustee of the Morigan Trust, and as Co–Trustee of the Sierra Trust, Jennifer A. Pacheco, individually and as Co–Trustee of the Buruka Trust, as Co–Trustee of the Bravo Trust, as Co–Trustee of the Crocodile Rock Trust, as Co–Trustee of the Inca Trust, as Co–Trustee of the Morigan Trust, and as Co–Trustee of the Sierra Trust, Michelle D. Pacheco, as Co–Trustee of the Buruka Trust, as Co–Trustee of the Bravo Trust, as Co–Trustee of the Crocodile Rock Trust, as Co–Trustee of the Inca Trust, as Co–Trustee of the Morigan Trust, and as Co–Trustee of the Sierra Trust, Susan C. Lybeck, as Co–Trustees of the Buruka Trust, as Co–Trustee of the Brava Trust, as Co–Trustee of the Crocodile Rock Trust, as Co–Trustees of the Inca Trust, as Co–Trustee of the Morigan Trust, and as Co–Trustee of the Sierra Trust, Patrice Pacheco, as Co–Trustee of the Margaret Donovan Trust, Matt Donovan, as Co–Trustee of the Margaret Donovan Trust, Mary Paterson, as Trustee of the Alex Paterson Trust and as Trustee of the Tori Patterson Trust, Maureen Parsons, as Trustee of the Michael Beebe Trust and as Trustee of the Patrick J. Beebe Irrevocable Trust, Plaintiffs

v.

CAMBRIDGE TECHNOLOGY PARTNERS (MASSACHUSETTS), INC. Defendant.

No. CIV. A. 98–12374–WGY.

United States District Court, D. Massachusetts.

March 1, 2000.

Jeffrey B. Rudman, Gabrielle R. Wolohojian, Lisa Pirozzolo, Hale & Dorr, Boston, MA, Peter S. McCormick, David C. Lundsgaard, K. Michael Fandel, Edward S. Pettigrew, Graham & Dunn, P.C., Seattle, WA, for Leonard J. Pacheco, Diane Pacheco, Jim Beebe, Tari Eastman, Miguelangel Aponte–Rios, Linda Pacheco, James A. Pacheco, John M. Pacheco, Michael Resler, Joseph B. Pacheco, Roberta L. Pacheco, Laura Pacheco, Jennifer A. Pacheco, Michelle D. Pacheco, Susan C. Lybeck, Patrice Pacheco, Matt Donovan, Mary Paterson, Maureen Parsons.

Jordan D. Hershman, Christopher F. Robertson, Lauren A. Stagnone, Justin M. Perrotta, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Cambridge Technology Partners (Massachusetts), Inc.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. *Introduction*

This case arises out of a stock for stock merger (the "Merger") between Cambridge Technology Partners (Massachusetts), Inc. ("Cambridge") and Excell Data Corporation ("Excell"), which closed on August 31, 1998 (the "Closing Date"). After a post-closing drop in the price of Cambridge stock, certain former Excell shareholders, including the plaintiff Leonard J. Pacheco (collectively, "Pacheco") sued, asserting claims against Cambridge for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and for breach of contract, common law fraud, and negligent misrepresentation. On January 28, 1999, this Court granted Cambridge's motion to dismiss the Exchange Act claim but denied the motion with respect to the common law claims. At the time, the Court indicated that Pacheco's remaining claims were "quite vulnerable to a well-pleaded motion for summary judgment." Cambridge here attempts to exploit that vulnerability, while Pacheco moves for leave to file an amended complaint in an effort to revive the once-dismissed Exchange Act claim.

### II. *Factual Background*

Founded in 1991, Cambridge is a systems integration and consulting firm based in Cambridge, Massachusetts. Its stock has been publicly traded on NASDAQ since its initial public offering in 1993. *See* Sims Aff. ¶ 1. From 1991 to 1997, the company was an explosive success with revenues growing from $9,000,000 to $430,329,000 over the period. *See id.* ¶ 2. From 1993 through the close of the second quarter of 1998, Cambridge never missed analysts' expectations. *See id.* ¶ 3.

During early 1998, Cambridge began negotiating for the acquisition of Excell. *See* Cambridge App. Ex. 11 at 32–42; Ex. 12 at 15–19. The parties undertook extensive negotiations regarding the merger. *See*

O'Hare Aff. ¶¶ 3–6. Section 5.8 of the Merger Agreement contained a representation and warranty by Cambridge that "[s]ince June 30, 1998, there has not been any material adverse change in the Business Condition of Cambridge." Cambridge App. Ex. 7. The term "Business Condition" was defined as follows: "As used in this Agreement, 'Business Condition' with respect to any entity means the business, financial condition, results of operations, assets or prospects (as defined below) . . . ." *Id.* at § 3.1. The term "prospects" was given the following meaning: "[P]rospects means events, conditions, facts or developments that are known to Excell and that in the reasonable course of events are expected to have an effect on future operations of the business as presently conducted by Excell . . . ." *Id.*

On August 27, 1998, an information statement was distributed to Excell shareholders disclosing the terms of the Merger (the "Information Statement"). *See id.* Ex. 8. The Information Statement contained a three-page section describing twelve risk factors that shareholders were encouraged to consider prior to approving the Merger. *See id.* One section, entitled "Variability of Quarterly Operating Results," warned:

> Variations in Cambridge's revenues and operating results occur from time to time as a result of a number of factors . . . . The timing of revenues is difficult to forecast because Cambridge's sales cycle is relatively long in the case of new clients and may depend on factors such as the size and scope of assignments and general economic conditions. Because a high percentage of Cambridge's expenses are relatively fixed, a variation in the timing of the initiation or the completion of client assignments, particularly at or near the end of any quarter, can cause significant variations in operating results from quarter to quarter and could result in losses . . . . Operating results and liquidity may be adversely

affected if market demand and revenues do not increase as anticipated.

*Id.* at 8–9. Pacheco executed an investor agreement (the "Investor Agreement") on August 31, 1998, in which he represented and warranted that he received and reviewed the Information Statement; understood that his investment in Cambridge stock involved risk; consulted his own attorney, accountant or investment advisor regarding the Merger; and was either an "accredited investor" or was knowledgeable and experienced in financial matters. *See* Cambridge App. Ex. 9. The Investor Agreement also contained a provision that stated, "Cambridge has made available to you ... the opportunity to ask questions and receive complete and correct answers from representatives of Cambridge concerning the terms and conditions of the Cambridge Common stock and to obtain any additional information relating to the financial condition and business of Cambridge." *Id.* ¶ 4.

In early August, 1998, Cambridge convened a meeting of the company's top officers (the "Operating Committee"). Notes from that meeting indicate that among several issues constituting the "charter of the group" was the "Q3 and Q4 crisis—what can we do to deal with this?" Wolohojian Aff. Ex. 12. On August 10, 1998, the Operating Committee discussed a "[d]efinite demand problem." *Id.* On August 17, 1998, the Operating Committee notes reflect that Bill Siebel was "scared to death about Q3" in some unspecified respect. *Id.* Ex. 16. On August 24, 1998, the Operating Committee notes state that Jim Sims ("Sims"), the Chief Executive Officer of Cambridge, believed there was a "demand problem in every unit except Peter Chadwick," and that a "dramatic solution is needed before our next numbers release." *Id.* Ex. 14.

On August 26, 1998, Sims informed Pacheco that "(a) there were not going to be any more surprises; (b) Cambridge would meet analysts' expectations for the third quarter; and (c) the third quarter was going to be a great quarter." Compl. ¶ 5.10. In addition, at all times prior to August 31, 1998, Cambridge was forecasting that it would hit $162,000,000 in revenues and $.25 per share in earnings for the third quarter of 1998 (the "Third Quarter"). *See* Cambridge App. Ex. 10; Toscanini Aff. ¶¶ 9–11.

On August 27, 1998, Sims told Bruce Glazier of Wellington Management that the market's expectations for Cambridge were "too high" and that Cambridge's revenue growth rate would be closer to 44–47% than the 50% previously predicted. *See* Cambridge App. Exs. 23–24. On August 31, 1998, a Cambridge representative phoned certain analysts and institutional investors and provided similar information. *See id.* Exs. 23, 26–27.

On September 3, 1998, Sims met with a group of institutional investors and stated that there was "uncertainty" regarding Cambridge's present operations. *See* Sims Aff. ¶ 14. The next morning, he spoke with an analyst, Mark D'Anollfo ("D'Anollfo"), and reiterated his concerns. *See id.* ¶ 17. On September 4, 1998, D'Anollfo downgraded Cambridge from a "Buy" to merely "Attractive." *See* Compl. ¶ 3.11. At the same time, D'Anollfo lowered his Third Quarter revenue estimated from $160,000,000 to $156,000,000. *See* Cambridge App. Ex. 50. Also on September 4, Cambridge's stock dropped 22%, the largest one-day drop in the company's history.

III. *Discussion*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A party opposing a motion for summary judgment "is not entitled to build a case on the gossamer threads of whimsey, speculation and conjecture."

*Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir.1962). Rather, "[t]here must be sufficient evidence supporting the claimed factual dispute to require a trial to resolve the parties' different versions; the evidence manifesting the dispute must be substantial." *Concord Auto Auction, Inc. v. Rustin,* 627 F.Supp. 1526, 1529 (D.Mass.1986).

### A. *The Contract Claim*

"In Massachusetts as elsewhere, absent ambiguity, contracts must be interpreted and enforced exactly as written." *Id.* at 1528. The obligation to enforce a contract according to its terms is even stronger where "the transaction is commercial, the principals practiced and represented by counsel, and the contract ... clear"; in such a case, "it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air." *Mathewson Corp. v. Allied Marine Indus., Inc.,* 827 F.2d 850, 856 (1st Cir.1987); *see also Fowler v. Boise Cascade Corp.,* 948 F.2d 49, 56 (1st Cir.1991) ("[C]ourts should not rewrite contracts, especially if the two contracting parties are two corporations acting at arms length.").

■ Cambridge contends that the plain and unambiguous language of the contract establishes that Cambridge made no representation or warranty regarding its future "prospects." Section 5.8 of the Merger Agreement contained the warranty that

"[s]ince June 30, 1998, there has not been any material adverse change in the Business Condition of Cambridge." The term "Business Condition" was defined in Section 3.1 of the Agreement to mean the "business, financial condition, results of operations, assets or prospects (as defined below) ...." The same section of the Agreement defined prospects as "events, conditions, facts or developments that are known to Excell and that in the reasonable course of events are expected to have an effect on future operations of the business as presently conducted by Excell ...." Thus, Cambridge argues that the Merger Agreement only imposed a duty of accuracy regarding "prospects" on Excell.[1] Without a corresponding duty on Cambridge, the company argues that Pacheco's breach of contract claim must fail because Pacheco only appears to challenge the fact that Cambridge failed to meet financial predictions regarding its performance for the Third Quarter.[2] In Cambridge's view, these claims center on Cambridge's "prospects" following August 31, 1998, not its "business, financial condition, or results of operations" as of August 31, 1998. As such, Cambridge contends that it is entitled to summary judgment on the breach of contract claim.

Cambridge is correct. The language of the Merger Agreement plainly establishes a nonreciprocal obligation between the

---

1. As Cambridge notes, this interpretation of "prospects" as nonreciprocal comports with several other nonreciprocal provisions in the Agreement. For example, Excell made representations and warranties regarding several items that Cambridge did not. *See* Cambridge App. Ex. 8 at § 3.5 (Excell's technology and intellectual property rights); § 3.7 (Excell's tax liability); § 3.12 (present or threatened litigation against Excell); § 3.13 (non-default by Excell on any legal instrument or judgment); § 3.14 (Excell's major contracts); § 3.15 (Excell's material customer relations); § 3.23 (Excell's environmental liability); § 3.24 (enforceability of Excell contracts); and § 3.27 (Year 2000 compliance of Excell computer systems). Furthermore, the representations and warranties of Excell concerning financial statements and its business

are more detailed and extensive than corresponding obligations incurred by Cambridge. *Compare id.* §§ 3.6, 5.5 *with* §§ 3.8, 5.8.

2. *See, e.g.,* Compl. ¶ 4.5 ("Cambridge management anticipated that the company's rate of revenue growth for the second half of 1998 and for 1999 would be less than Cambridge and analysts following the stock expected."); ¶ 4.5 (alleging that Cambridge knew but failed to disclose that certain deferred projects would cause Cambridge to miss revenue expectations for the Third Quarter by $5–6,000,-000); ¶ 5.12 (alleging that Cambridge knew but failed to disclose that revenues in the second half of 1998 and 1999 were likely to grow by 40–45% instead of 50%).

parties. Section 3.1 defines "Business Condition" to include "prospects," but immediately refers the reader to the specific definition of "prospects" that follows. The term "prospects" is then defined only with respect to the expected performance of Excell, not Cambridge. One may be tempted to view this as a drafting error, given that the generic term "Business Condition," which applies to "any entity" and is used throughout the Agreement, is being defined in a section of the Agreement dealing specifically with Excell's representations and warranties. Nevertheless, Section 3.1 also contains a definition for the term "Subsidiary" which appears immediately after the term "Business Condition" and immediately before the term "prospects." The definition for "Subsidiary" expressly refers to "any corporation or other entity," demonstrating that the parties clearly knew how to draft a reciprocal definition. Thus, the fact that in the same paragraph "prospects" was defined solely with reference to Excell suggests that the parties were consciously allocating risks, rather than unwittingly drafting a nonreciprocal provision. As the First Circuit has emphasized, "[c]ourts should not attempt to accomplish by judicial fiat what [a party] neglected to achieve contractually." *Federal Deposit Ins. Corp. v. Singh*, 977 F.2d 18, 23 (1st Cir.1992) (internal quotation omitted).

Moreover, Cambridge's construction of the Agreement comports with the practical realities of the deal. "Material adverse change" provisions, or "MACs" as they seem to be known within the mergers and acquisitions bar, are among the most heavily negotiated portions of any business combination agreement. *See* Rodrigo J. Howard, *Allocating the Risks of Interim Changes: MACS and MAES in Recent Technology M & A Agreements*, 1089 P.L.I./Corp. 109, 113 (Dec.1998). Moreover, "[t]he inclusion of future 'prospects' in the definition of a MAC ... is often a contentious issue." *Id.* at 123. Given the volatile character of high technology markets, due both to the rapidly changing nature of the industry itself and to the increasingly fickle and dramatic actions of the investing public, sellers within high technology mergers and acquisitions typically do not cover "prospects" in their warranties and representations. *See id.* ("In technology company transactions, 'prospects' are generally omitted from the MAC ... definition ...."); *see also* Michael J. Halloran & D. Stanley Rowland, *Changes in Material Adverse Change Provisions in High Tech Deals*, The M & A Lawyer, Mar. 1999 ("More exceptions are being grafted onto [MAC] provisions because of the high volatility experienced in stock trading prices and in economic and market conditions ...."). Viewed in this light, the nonreciprocal obligations of Cambridge and Excell with respect to "prospects" in the Agreement's warranty provision make eminent business sense.

Pacheco raises no serious opposition to this construction of the Agreement. Indeed, rather than contest this interpretation of the Agreement, Pacheco's opposition to summary judgment focuses on characterizing Cambridge's conduct. Pacheco argues that Cambridge failed to disclose *actual* material changes in its business condition, not forecasted ones. That is, Pacheco characterizes Cambridge's failure to disclose as one involving facts that had already occurred, not prospects. Thus, because the express warranty of the Merger Agreement required Cambridge to disclose all material changes in its business, financial condition, results of operations, or assets, Pacheco argues that liability is at the very least a triable issue. *See* Pacheco Opp'n Mem. at 3 ("All that is required [for liability] is that a material adverse change *occurred* during the Warranty Period.").

Pacheco's argument relies essentially upon three pieces of evidence: (1) Cambridge's recognized revenue growth rate declined from 19% for the first two months of Q298 to 1% for the first two months of Q398 (the Warranty Period); (2) Cam-

bridge's total revenue growth rate declined from 20% for the first two months of Q298 to negative 7% for the Warranty Period; and (3) Cambridge's recognized revenue growth rate declined from 49% for the first two months of Q397 to 32% for the Warranty Period.[3] None of this evidence makes out a breach of the warranty, however, because it is either immaterial as matter of law or relates fundamentally to forward-looking "prospects" for which Cambridge incurred no warranty obligation.

The first two pieces of evidence which Pacheco uses to support the claim that Cambridge suffered declining revenue during the Warranty Period are immaterial as matter of law. It is unclear why Pacheco compares the Warranty Period with the first two months of the immediately preceding quarter rather than with the comparable period from the previous year. Absent some evidence that sequential comparison is especially probative for Cambridge's business line, the ordinary comparison is year-over-year. *See Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 10 (1st Cir.1991). Thus, the Court focuses on Pacheco's third piece of evidence, that Cambridge's total revenue as tracked for the first two months of Q398 declined precipitously from the same period for the previous year.

Pacheco is correct to argue that during the Warranty Period, Cambridge's recognized revenue growth rate was 32% over the previous year, not 57% as claimed by Cambridge. Cambridge obtained the 57% figure by including within the Warranty Period revenues generated by Peter Chadwick, a computer consulting firm that it acquired in the fourth quarter of 1997. As Pacheco correctly argues, including those figures within the Warranty Period while excluding them from the comparison period for 1997 results in a stacked deck. Cambridge appears to concede as much,

given its acknowledgment that SEC rules require reporting revenue with both periods including the acquired entity's revenue. *See* Wolohojian Aff. Ex. C at 192, 194. Thus, Pacheco is correct to point out that recognized revenue for the first two months of Q398 grew only 32% over the previous year, not 57% as claimed by Cambridge.

Pacheco is also correct to point out that Cambridge's *total* revenue figures for the Warranty Period (as opposed to its recognized revenue figures) may have constituted evidence that Cambridge would miss Q398 projections. Cambridge argues that as of August 31, 1998 (the end of the Warranty Period) it had achieved approximately 50% of its $162 million revenue estimate for the entire quarter. This amount is very much in line with Cambridge's historical mid-quarter results, thus leading Cambridge to argue that no material adverse change had occurred as of August 31, 1998. *See* Toscanini Aff. ¶ 7. As Pacheco notes, however, Cambridge only recognizes revenue upon the signing of a contract. Thus, to obtain the full picture of Cambridge's mid-quarter performance, one must compare *total* revenue (both signed and unsigned agreements for the quarter to date) to projected revenue. This analysis shows that for the Warranty Period, Cambridge had only generated total revenues equal to 53% of projected revenue for the quarter. By contrast, during the first two months of both Q198 and Q298 Cambridge generated total revenues equal to approximately 63% of the target for the quarter. *See* Pacheco Statement of Facts ¶ 31. According to Pacheco, these figures "demonstrate that, as of August 31, the company was projecting it would generate less than $151 million in Q3 revenues—$11 million short of the revenues Cambridge had previously forecasted it would achieve and had led the public, [Pa-

---

**3.** Pacheco makes parallel allegations with respect to Cambridge's North American business unit. Because the same legal interpreta- tion applies to these allegations, they are not discussed separately.

checo] and Wall Street to expect." Pacheco Opp'n Mem. at 9.[4]

There are at least two reasons why Pacheco's view of the evidence, even if correct, does not suffice to avoid summary judgment. First, Pacheco has only demonstrated that (1) recognized revenue grew 32% for the Warranty Period over the previous year, and (2) total revenue for the Warranty Period comprised a smaller percentage of projected quarter results than in the same period for Q198 and Q298. The first fact demonstrates only that Cambridge is being overzealous in its accounting *now* in its pleadings, not that it must have disclosed evidence at the time which indicated that Q398 results may only show a 32% growth rate at quarter's end. The second fact constitutes the same type of sequential comparison that cannot be deemed material without some predicate explanation of why sequential rather than year-over-year analysis is preferred. *See Capri Optics,* 950 F.2d at 10.

Second, and more importantly, Pacheco has only demonstrated facts that bear on the expected ability of Cambridge to meet third quarter expectations; in other words, facts that bear on Cambridge's "prospects." Pacheco appears to recognize as much in its opposition memorandum:

> The decline in unsigned revenue is reflected in the company's own *forecasts* which were freely available to senior management . . . . These demonstrate that, as of August 31, the company was *projecting* it would generate less than $151 million in Q3 revenues—$11 million short of the revenues Cambridge had previously *forecasted* it would achieve and had led the public, [Pacheco] and Wall Street to expect.

Pacheco Opp'n Mem. at 9 (emphasis added). In essence, Pacheco wants the Court to adopt a rule of law that would eviscerate the distinction between accounting and forecasting. By the parties' express agreement, Cambridge's warranties only covered the accuracy of representations about its current operations, not its future prospects. The availability of internal projections that suggested end-of-quarter results might miss expectations bears only on the latter, non-warranted category of information.

It is a matter of universal business practice that accounting results are maintained on a quarterly basis. The fact that analysts and the Street crave intra-quarterly information does not mean that companies such as Cambridge incur liability by maintaining *internal* company projections that may differ from *external* reports. As one court recently stated:

> It is clear that Sybase generated countless budget summaries and reports as a way of tracking its financial condition. Sybase's various internal budget forecasts often yielded different numbers, because different managers and executives used different types of data and field information to compile these figures. Of all the internal budgets that it generated, Sybase maintains that its official internal forecast was contained in the Yellow Sheet internal budget summary. Plaintiffs have done nothing to controvert this contention, instead only charging that Sybase should have used other budget summaries that are, in plaintiffs' view, more accurate.

*In re Sybase, Inc. Securities Litig.,* 48 F.Supp.2d 958, 962 (N.D.Cal.1999); *see also In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1411 (9th Cir.1996) ("Any firm generates a range of estimates internally or through consultants. It may reveal the

---

4. Pacheco also relies upon a number of statements taken from internal company meeting notes that purportedly support the view that Cambridge knew Q398 was going to be disastrous. *See* Pacheco Opp'n Mem. at 15. Many of these statements are taken out of context or are so vague as to be unreliable evidence of management knowledge. More fundamentally, however, all of the statements purportedly refer to Cambridge's ability to meet third quarter expectations. As such, they all refer to Cambridge's "prospects," which, as noted above, renders them nonactionable under the parties' agreement.

projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis.' "). In this case, there is not even a question whether Cambridge's official projections remained "reasonable" in light of mid-quarter information. Even if the official projections did become unreasonable under the pertinent securities law standard,[5] they would still be misrepresentations only with respect to the "prospects" of Cambridge.[6] As such, they are not covered by the warranty.

Put simply, the question in this case is whether a company's internal knowledge of likely difficulties in meeting future earnings expectations bears on its "prospects" or its "results of operations." This Court rules that it bears on the former; that is, the intra-quarterly information that Pacheco views as evidencing a material adverse change in Cambridge's current business condition instead must be conceived of as information relating only to Cambridge's ability to meet end-of-quarter expectations, i.e., its "prospects." Any other construction would render the word "prospects" meaningless and the parties' stylized drafting convention superfluous. Such judicial revision is unmerited in this case. *See Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 963 (D.Mass.1991) (Caffrey, J.) ("[A] contract must not, whenever possible, be construed so as to render any of its terms meaningless."); *Edmund Wright Ginsberg Corp. v. C.D. Kepner Leather Co.*, 317 Mass. 581, 587, 59 N.E.2d 253 (1945) ("It is a general rule in the construction of contracts that whenever practicable every word shall be given some effect.").

A similar situation was addressed in *Goodman Mfg. Co. v. Raytheon Co.*, Civ. A. No. 98 Civ. 2774(LAP), 1999 WL 681382 (S.D.N.Y. Aug.31, 1999). The plaintiff agreed to buy a wholly owned subsidiary of the defendant. The defendant represented and warranted that there had been "no material adverse change in the Business Condition of [the subsidiary]," where the term "Business Condition" was defined to include "business assets or financial condition." *Id.* at *13. The plaintiff argued that the subsidiary's "future prospects" had changed during the warranty period and that therefore the defendant breached the warranty provision. The court rejected the view that "Business Condition" as defined must include "future prospects":

> As for plaintiff's theory that "future prospects" must be included in the definition of "financial condition," "business," or "assets," the parties failed to include such a meaning in the Agreement, and I decline the invitation to insert it by judicial construction. Since the parties limited the warranties and representations that make up the Agreement, I may not now change them but must instead hold [the plaintiff] to the deal it negotiated.

5. *See In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1, 16 (D.Mass.1999) ("[I]nformation regarding the impending results of a quarter might need only be disclosed when statements are made very near to the end of that quarter.").

6. This is also the problem with Pacheco's reliance on the efficient market hypothesis. Pacheco argues that "stock markets are presumed to be efficient, reflecting all currently known information." Pacheco Opp'n Mem. at 10. Thus, the story goes, the market's adverse reaction to Cambridge's September 4, 1998 announcement (in which the price of Cambridge stock dropped some 22%) constitutes "dispositive evidence" that the disclosed changes were both material to the market and not previously known by the market. Pacheco even offers the testimony of an expert in valuation to support this argument. *See id.* at 11 (noting that Professor Glenn Hubbard will testify that "changes in stock prices are rational responses to the arrival of new information to the market"). Putting aside the merits of this syllogistic proposition, it does nothing to change the fact that the market was responding to information about Cambridge's *prospects*. On September 4, Cambridge disclosed that its long-term revenue growth rate may drop to 40–45% and that it may not meet expectations for Q398 and Q498. This information may indeed have been material to the market, but it is not covered by the parties' warranty.

*Id.* at \*14. Here the justification for keeping the definitions of "Business Condition" and "prospects" distinct is even stronger, given that the Agreement evinces a specific intention by the parties to exclude future expectations with respect to Cambridge.

For the foregoing reasons, Pacheco has failed to raise a dispute of material fact with respect to the breach of warranty claim. The Court therefore ALLOWS Cambridge's motion for summary judgment as to the breach of warranty claim.

### B. *The Fraud and Misrepresentation Claims*

Pacheco bases the fraud and negligent misrepresentation counts on: (1) Cambridge's representation and warranty in the Merger Agreement that "[s]ince June 30, 1998, there has not been any material adverse change in the Business Condition of Cambridge"; and (2) several statements made by Sims on August 26, 1998 to Excell shareholders. *See* Compl. ¶¶ 5.10, 5.13. Cambridge argues that neither of these types of alleged misrepresentations can support a claim for fraud or misrepresentation.

#### 1. *Material Adverse Change in Prospects Between June 30 and August 31, 1998*

In order for Pacheco to have a triable case of fraud based upon Cambridge's representation that no "material adverse change in the Business Condition of Cambridge" occurred between June 30 and August 31, 1998, Pacheco must demonstrate that the statement was false. As described above, the term "Business Condition" did not include the "prospects" of Cambridge and, therefore, Pacheco's fraud claims premised upon the warranty representation must fail as matter of law.

Pacheco's fraud claims premised upon the warranty representation also fail because Pacheco has not demonstrated that the nondisclosed information—even if not related to "prospects" of Cambridge—was

material. In the Complaint, Pacheco charges that by August 26, 1998, Cambridge knew that "revenues for the third quarter of 1998 were not going to meet analyst expectations—they would probably fall short by $5–6 million." Compl. ¶ 5.12. To determine whether this factual allegation could constitute a "material adverse change," the Court may look to the law governing "materiality" under the Exchange Act. *See Milton v. Van Dorn,* 961 F.2d 965, 969 (1st Cir.1992) (holding that same Section 10[b] standard of "materiality" governed securities fraud, common law fraud, and breach of contract claims).

Under that standard, a revenue shortfall of $5–6,000,000 on gross revenues of approximately $160,000,000 constituted only a three percent miss. Numerous cases hold similar shortfalls immaterial as matter of law. *See In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 514 (9th Cir.1991) (holding immaterial a ten percent quarterly revenue shortfall); *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1248–49 (N.D.Cal.1998) (holding immaterial an eight percent quarterly revenue shortfall and a nine percent quarterly earnings shortfall); *In re Silicon Graphics, Inc. Securities Litig.,* 970 F.Supp. 746, 766 (N.D.Cal.1997) (holding immaterial a five percent quarterly revenue shortfall); *cf. Glassman v. Computervision Corp.,* 90 F.3d 617, 633 (1st Cir.1996) (noting that "minor drop of a few percent is not adequate to support the claim that the difference in backlog levels between quarters was material").

Pacheco also alleges that, as of August 26, 1998, Cambridge knew but concealed that its long-term growth prospects had declined from 50% to 40–45%. Numerous market analysts, however, had already pegged Cambridge's long-term growth at between 40–50%, with some projecting growth between 40–45% before the Closing Date. *See* Cambridge App. Ex. 2 (chart summarizing Exs. 12–35). Allegedly undisclosed information which the mar-

ket has already perceived is immaterial as matter of law. *See Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 210 (D.Mass. 1994) (Wolf, J.) (market analysts "fully perceived" the allegedly undisclosed information, thus rendering it immaterial); *Pinkowitz v. Data General*, Civ. A. No. 90–11854–Z, 1991 WL 288829 at *3 (D.Mass. Dec.27, 1991) (Zobel, J.) (publicly known information not actionable as matter of law); *see also In re Tseng Labs, Inc. Securities Litig.*, 954 F.Supp. 1024, 1029 (E.D.Pa.1996) (because information already disclosed in analyst reports, "facts allegedly omitted by Defendants would already be reflected in the stock's price"); *In re Cypress Semiconductor Securities Litig.*, 891 F.Supp. 1369, 1379 (N.D.Cal. 1995) (alleged nondisclosure of information, already "credibly available" to public through analyst reports, immaterial as matter of law).

Moreover, "[a]n issuer is not required to 'disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market .... Reasonable investors understand that businesses fluctuate, and that past success is not a guarantee of more of the same. There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated.' It is only when 'the issuer is in possession of [hard] nonpublic information that the quarter in progress will be an extreme departure from the range of results which could be anticipated based on currently available information' that disclosure might be required under the securities laws." *Glassman*, 90 F.3d at 632 n.24 (*quoting Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210 [1st Cir.1996] ). In the present case, Pacheco's allegations and the summary judgment record simply do not suffice to establish "an *extreme* departure from the *range* of results which could be anticipated based on currently available information." *Shaw*, 82 F.3d at 1210 (emphasis added).

### 2. *Oral Statements by Sims*

Pacheco alleges that on August 26, 1998, Sims told Pacheco that "(a) there were not going to be any more surprises; (b) Cambridge would meet analysts' expectations for the third quarter; and (c) the third quarter was going to be a great quarter." Compl. ¶ 5.10. Cambridge contends that none of these statements are actionable as matter of law because: (a) any reliance that Pacheco may have placed on these statements is unreasonable as matter of law; (b) they are accompanied by legally sufficient cautionary language; and (c) they constitute "puffery." Only the last of these arguments has merit.

■ Cambridge argues that any reliance by Pacheco upon the August 26 oral statements is unreasonable as matter of law due to the express language of the Investment Statement: "No person has been authorized to give any information or to make any representations not contained in this Information Statement in connection with the matters referred to· herein and, if given or made, such information or representations must not be relied upon as having been authorized by Cambridge or Excell." Cambridge App. Ex. 8 at 1–2. In *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 801 (1st Cir.1987), the plaintiffs purchased units of a company pursuant to an offering memorandum "replete with warnings" about the risks involved in the transaction. When the plaintiffs lost their investment, they alleged that prior to receiving the memorandum, the defendant's representative made false oral statements. The First Circuit held those statements nonactionable on the basis of the explicit warnings contained in the offering memorandum. *See id.* at 805; *see also Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 416 (1st Cir.1989) ("Insofar as Jackvony argues that pre-Agreement statements that Hospital Trust would keep Columbus separate for five years or more were materially misleading, his claim fails because in light of the later

**80**

Agreement and Prospectus, he could not reasonably have relied upon them.").

Cambridge, however, ignores a section of the Investor Agreement that stated, "Cambridge has made available to you ... the opportunity to ask questions and receive complete and correct answers from representatives of Cambridge concerning the terms and conditions of the Cambridge Common stock and to obtain any additional information relating to the financial condition and business of Cambridge." Cambridge App. Ex. 9 ¶ 4. This provision represents evidence that the parties intended Pacheco to have a meaningful opportunity to ask questions of Cambridge. The disclaimer in the Information Statement is, thus, at the very least contradicted by the provision of the Investor Agreement. For that reason, the Court rejects the view that the Investor Statement renders Pacheco's reliance unreasonable.

■ Cambridge also argues that the statements should be nonactionable because they were accompanied by sufficient cautionary language to render them nonactionable: "[W]hen statements of 'soft' information such as forecasts, estimates, opinions or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading." *Glassman*, 90 F.3d at 626 n. 11 (quoting *Shaw*, 82 F.3d at 1213). Cambridge premises this "bespeaks caution" defense on the Investment Statement that was given to each investor one day after the alleged statements made by Sims. It does not appear, however, that the First Circuit has ever held that noncontemporaneous cautionary disclosures can suffice to render statements immaterial as matter of law. Accordingly, the Court declines to shield the August 26 oral statement under the bespeaks caution doctrine.

■ Cambridge's final argument has more merit. As the First Circuit noted in

*Shaw*, 82 F.3d at 1218 n. 32, "Under the common law of fraud, courts typically would find ... [optimistic] statements to be mere 'puffing' or sales talk upon which no reasonable person would rely, and thus to be legally insufficient to support a claim." *See also Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.*, 976 F.2d 58, 65 (1st Cir.1992) (statements respecting future profitability "constitute nothing more than 'puffing' or 'trade talk' upon which no reasonable person would rely"); *In re Peritus Software Servs., Inc. Securities Litig.*, 52 F.Supp.2d 211, 220 (D.Mass.1999) (corporate puffery rule covers loose optimism about a company's future prospects); *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 54 (D.Mass.1998) (Lasker, J.) ("[I]t would be patently unreasonable for an investor to consider 'puffery' when engaged in investment decision making."). Massachusetts has followed this trend since at least 1945: "[N]ot all representations made by a seller are actionable. He is allowed some leeway in representations which may be regarded as 'puffing,' or such as are only matters of opinion or belief, or such as are merely promissory in nature." *Moran v. Levin*, 318 Mass. 770, 773, 64 N.E.2d 360 (1945); *Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 79, 575 N.E.2d 70 (1991) (statement on which liability for misrepresentation may be based must be one of fact, not expectation, estimate, or opinion); *see also Greenery Rehab. Group, Inc. v. Antaramian*, 36 Mass.App.Ct. 73, 75, 628 N.E.2d 1291 (1994) (puffery that tenants were "solid" and "good as gold" not actionable).

The Court rules that the statements made by Sims constitute nonactionable puffery. As Cambridge has demonstrated in its briefing, representations similar to each of the statements made by Sims have been held immaterial as matter of law in other cases:

"There are not going to be any surprises."

*See, e.g., Karacand v. Edwards*, 53 F.Supp.2d 1236, 1252 (D.Utah 1999)

(statement that "the company did not expect any surprises in the fourth quarter" held "meaningless and immaterial" as matter of law).

"Cambridge would meet analysts' expectations for the third quarter."

*See, e.g., Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) (statements that "results during the remainder of 1992 should be in line with analysts' current projections" and that company had "an expected annual growth rate of 10% to 30% over the next several years" held immaterial as matter of law); *Thornton v. Micrografx, Inc.*, 878 F.Supp. 931, 935 (N.D.Tex.1995) (dismissing claim predicated on defendant's statement that "he is comfortable with Wall Street estimates of 35% to 40% revenue growth this year"); *In re Browning–Ferris Indus., Inc. Sec. Litig.*, 876 F.Supp. 870, 894 (S.D.Tex.1995) (officer's statement that he was "comfortable with analysts' earnings estimates for the year" held not actionable); *Pitten v. Jacobs*, 903 F.Supp. 937, 941–44 (D.S.C.1995) (dismissing claim predicated on defendant's statement that he "was 'comfortable with' analysts' earnings estimates"); *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 212 (D.Mass.1993) (dismissing with prejudice claim predicated on statement that officer is "comfortable with a wide range of street estimates for ... earnings").

"The third quarter [is] going to be a great quarter."

*See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 805 (2d Cir.1996) (statement that company is expecting strong year for its businesses held nonactionable); *Hillson Partners Ltd. Partnership v. Adage Inc.*, 42 F.3d 204, 216 (4th Cir.1994)

(statement that company was "on track toward reaching its previously forecast goal" immaterial); *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1095 (N.D.Cal.1994) (statement that "business will be good this year" held nonactionable).

Cambridge Mem. at 13–14. The Court follows these cases and holds that the statements challenged in the complaint are nonactionable as matter of law.

**C.  *Pacheco's Motion to Amend***

■ Pacheco has moved to amend the Complaint to reinstate the claim under the Exchange Act. Pacheco relies upon the same representations challenged in its common law fraud count, with the addition of one new allegation: that Sims told Pacheco on August 26, 1998 that "the price of Cambridge's stock would be in the upper 40's by the end of the quarter." Pacheco Mot. Am. Mem. at 6. For the same reasons described above with respect to the common law fraud count, the Court rules that the original representations are insufficient, as matter of law, to ground a claim under the Exchange Act.[7] The alleged guarantee by Sims that Cambridge's stock would trade at a certain price by the end of the quarter is also nonactionable because, as matter of law, any reliance by an investor on a purported guarantee of a specific stock price is unreasonable. *See Glassman*, 90 F.3d at 626 ("Forecasts are not guarantees of, or insurance policies for, a firm's future performance, nor are they understood as such by reasonable investors."); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994) (financial projections and generalized statements of optimism "are not guarantees of future financial performance, nor are they understood as such by reasonable investors"); *Haft v. Eastland Fin. Corp.*,

---

7. Specifically, the representation contained in the Merger Agreement is nonactionable because it did not concern the "prospects" of Cambridge and Pacheco has only attempted to demonstrate the falsity of the representation through evidence of Cambridge's Q398

"prospects." *See supra* Section III(B)(1). The original three oral statements by Sims are nonactionable because, as discussed above, they constitute puffery. *See supra* Section III(B)(2).

772 F.Supp. 1315, 1320 (D.R.I.1991) (holding statement that stock should trade in the $10.50 to $11.00 range immaterial as opinion).

### D. *The Counterclaims*

Pacheco has also moved this Court to exclude from trial any evidence or argument relating to claims and factual issues that have been the subject of arbitration. Given the current posture of this case, Pacheco's motion is more in line with a request to dismiss Cambridge's remaining counterclaims. A review of the arbitrator's decision reveals that Pacheco's motion has substantial merit. Specifically, it appears that all claims related to the "business condition of Excell" and the "undisclosed tax liabilities" were decided in favor of Pacheco. Moreover, the factual supports for these claims mirror the factual allegations in Cambridge's counterclaims.

At the same time, however, it is not clear that all the allegations made by Cambridge against Pacheco were eliminated by the arbitrator's decision. Both the arbitrator's decision and Pacheco's motion identify specific claims that were *not* presented at the Arbitration Hearing. *See* Pacheco's Mot. in Limine Mem. at 5 n. 2; Pacheco's Supp. Mot. in Limine Mem. Ex. A. While it may be that these claims lack substance, based on the incomplete record currently before this Court, the counterclaims cannot yet be dismissed.

### IV. *Conclusion*

For the foregoing reasons, the Court ALLOWS the motion for summary judgment [Docket # 63] and DENIES the motion to amend [Docket # 48].