**John BARON, Alan Laites, and Jewish Foundation for Education of Women, Plaintiffs**

v.

**Richard A. SMITH, Peter C. Read, Francis E. Sutherby and G. Gail Edwards, Defendants**

**No. CIV.A.02–11189GAO.**

United States District Court, D. Massachusetts.

Sept. 30, 2003.

Gus P. Coldebella, Esq., Stuart M. Glass, Esq., Richard A. Oetheimer, Esq., Goodwin Procter, LLP, Boston, for Francis E. Sutherby, Peter C. Read, G. Gail Edwards, Defendants.

Theodore M. Hess–Mahan, Shapiro Haber & Urmy LLP, Boston, for Jewish Foundation for Education of Women, Alan Laites, John Baron, Plaintiffs.

David P. Kowal, Esq., Richard J. Rosenweig, Esq., Thomas J. Sartory, Esq., Goulston & Storrs, PC, Boston, for Richard A. Smith, Defendant.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

This securities fraud class action suit is brought by shareholders in GC Companies, Inc. ("GCX" or the "Company"). The plaintiffs claim that they were led by the defendants to believe that GCX would use the bankruptcy process to reorganize into a leaner, more competitive company, but the actual outcome of the bankruptcy was quite different. Although the company's creditors were paid something on their claims, the plaintiffs' stock was rendered nearly worthless.

The defendants now move to dismiss arguing that the plaintiffs have not adequately pleaded viable securities fraud claims. I agree with the defendants and find that the complaint must be dismissed because it does not set forth facts which, if believed, would establish either that the defendants omitted disclosure of material facts or that they acted with the requisite scienter.

A. *Summary of Facts*

1. *The Backdrop*

GCX was spun off from its parent, Harcourt General, Incorporated, in 1993. GCX's business consisted of three main endeavors: it operated a chain of movie theaters in the United States (General Cinema Theaters); it operated, or participated with other entities in operating, movie theaters in Mexico and South America; and it managed a pool of investment capital. GC Companies, Inc., issuer of the stock held by the plaintiffs, is the parent of a number of wholly owned subsidiaries through which the business of the enterprise was conducted. At all relevant times, the Company's audited financial statements were presented on a consolidated basis.

In the late nineties, GCX's movie theater business began to founder. Its September 13, 2000, Quarterly Report ("September 2000 Form 10–Q") disclosed that the Company faced intense competitive pressure in the theater business as a result of market saturation. A surge in the construction of new movie theaters featuring a large number of screens and other amenities put older theaters, including many operated by GCX, at a disadvantage. Customers preferred the newer theaters, putting pressure on all industry members to build new theaters and get rid of older ones. GCX stated in its September 2000 Form 10–Q that in light of these difficulties, "the Company is actively considering all of its strategic alternatives, including additional closings of nonprofitable units,

sales of certain of the Company's assets, or a potential restructuring, recapitalization or bankruptcy reorganization of the Company." Coldebella Decl., Ex. A at 18.

On October 11, 2000,[1] GCX petitioned for bankruptcy protection under Chapter 11 of the Bankruptcy Code. Some of its domestic subsidiaries simultaneously commenced Chapter 7 liquidation proceedings. A press release announcing the bankruptcy filings stated:

> GC Companies, Inc. (N.Y.SE: GCX), parent company of General Cinema Theaters, Inc., announced today that GC Companies and certain of its domestic subsidiaries, including General Cinema Theaters, Inc., are filing voluntary petitions to reorganize their business under Chapter 11 of the U.S. Bankruptcy Code. The Company further stated that certain of its subsidiaries in Florida, Georgia, Louisiana and Tennessee are filing Chapter 7 liquidation proceedings.... In its filings, the Company will report assets of $328.9 million and total liabilities of $195.1 million as of August 31, 2000.
>
> ....
>
> Through the Chapter 11 process, the Company expects to be able to terminate unprofitable leases, reduce the Company's operating expenses and make necessary improvements to the business to create a strong competitive future for General Cinema. While the Company completes the restructuring, its operations are expected to continue.
>
> ....
>
> The Company is arranging up to $45 million of debtor in possession financing to provide the Company with resources to fund its operations during the Chapter 11 proceedings. Employees will continue to be paid and vendors will be paid for post-petition purchases of goods.

Coldebella Decl., Ex. B (Form 8–K, Ex. 99). The press release also contained the now familiar caution about "forward looking statements" calculated to invoke the "safe harbor" afforded by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). GCX's optimistic forecast that it would emerge from bankruptcy intact apparently sufficiently impressed the New York Stock Exchange ("NYSE") so that GCX was permitted to continue listing its stock, despite the bankruptcy. According to the plaintiffs, the NYSE's usual practice is to delist a company once it is in bankruptcy.

In its annual report for 2000 ("2000 Form 10–K"), filed in January 2001, GCX repeated that a "principal reason for the Company's Bankruptcy Proceedings was to permit the Company to reject real estate leases that were or were expected to become burdensome due to cash losses at these locations." Pls.' Ex. E at 3.

The bankruptcy did not result in the outcome predicted by the press release or by the annual report. After several months of contentious wrangling between the company's creditors and its management, on June 13, 2001, GCX announced that it had signed a letter of intent with certain buyers to purchase all of GCX's stock. It also announced that the current shareholders would only receive payment for their shares if the liquidation of GCX's investment portfolio yielded more than $90 million. After the announcement, the stock price dropped to 25 cents per share. At the close of trading on October 11, 2000, the date of the bankruptcy filing (and the commencement of asserted "class period"), the stock traded at $1.375. During the class period, the price of the stock

---

1. This date also marks the beginning of the class period.

fluctuated between roughly $2 and $3 per share.

### 2. *The Alleged Omissions*

The complaint alleges securities fraud in a somewhat imprecise manner. Rather than identifying particular misrepresentations or omissions, the complaint refers to the "impression" created by the Company's public statements and filings. For instance, it is alleged that the October 11 press release "created the impression that GCX was a viable company that had elected to file for bankruptcy solely for tactical, business reasons, in order to eliminate leases on unprofitable theatres." Compl. ¶ 22. Also, by persuading the NYSE to continue listing the Company's stock, the defendants "continued to foster the false impression that GCX was a viable company." *Id.* ¶ 23. Likewise, through the description of the Company's business in its 2000 10–K, the "defendants affirmatively sought to continue to foster the impression that GCX was in sound financial health, and had sought the protection of the bankruptcy laws only as a cost-savings measure." *Id.* ¶ 29.

The defendants correctly point out that merely alleging the "fostering" of "impressions" does not adequately plead affirmative misrepresentations. It appears that the plaintiffs do not claim that the defendants made affirmatively false statements, but rather that the defendants omitted to state additional information necessary to keep the disclosed information from being misleading. *See* Pls.' Opp'n at 2 (arguing that defendants "fostered" the "false impression" of the Company's financial health "by their failure to disclose several material facts").

According to the plaintiffs, the shareholders were given an inaccurate picture of GCX's financial health as it entered bankruptcy because the defendants failed to disclose essentially three important facts. First, the plaintiffs allege that the defendants failed to disclose the fact that the commencement of bankruptcy proceedings constituted an event of default under GCX's guaranty of 50% of the debt of a South American joint venture it had entered into with another theater operator. Compl. ¶ 34. Second, they allege that the defendants improperly failed to inform its investors that $6.8 million realized from the sale of an investment in Mexican theaters was not part of the bankruptcy estate. *Id.* ¶ 38. And third, the plaintiffs allege that GCX did not disclose that the bankruptcy caused a default under certain "synthetic" lease obligations and that the default triggered approximately an additional $120 in liabilities that were not reported by the defendants. *Id.* ¶¶ 40—43. The plaintiffs contend that all of these facts were known to each of the defendants, and that by not disclosing them while making optimistic public statements, they misled shareholders as to the value of GCX's stock.

### B. *Materially Misleading Omissions*

### 1. *The Pleading Standard*

■ To establish a claim for securities fraud, a plaintiff must allege that a defendant "(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u–4(b)(1). In their complaint, the plaintiffs must set forth their claims with sufficient detail and specificity to meet the requirements of the PSLRA. Under the PSLRA, the complaint must state "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information

and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir.1999) ("The effect of [the PSLRA's pleading requirement] is to embody in the Act itself at least the standards of Rule 9(b), Fed.R.Civ.P."). However, while a successful complaint must be heavy in particulars, "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir.2002).

In this case, the plaintiffs assert that the defendants committed fraud by omitting material information from the Company's public statements. In *In re Cabletron*, the First Circuit summarized the test for the materiality of omitted information as follows:

> A fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Information which would have assumed actual significance in the deliberations of a reasonable shareholder is material. In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. Thus, we review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality.

*Id.* at 34 (quotations and citations omitted). Because this standard essentially paraphrases a pre-PSLRA securities fraud decision by the Supreme Court, *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), it can be concluded that the standard for "materiality"

was not changed significantly by the PSLRA.

The First Circuit also has made clear that context is important in evaluating whether a party has made a material misstatement or omission. In *Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir.1994) (a pre-PSLRA securities fraud case), the First Circuit held that:

> the fact that a statement is literally accurate does not preclude liability under federal securities laws. Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers. Under the foregoing standards, emphasis and gloss, can, in the right circumstances, create liability.

*Id.* at 175 (citations and quotations omitted). A good illustration of these principles is offered by the facts in *Lucia* itself. There the court found that the plaintiffs had adequately presented an issue of fraud by omission by showing that the defendants had omitted disclosure of unfavorable six-year comparisons between "junk" bonds and Treasury bonds, while disclosing more favorable ten-year comparisons. *Id.* at 176. The First Circuit observed that "the ten-year comparison paints a much rosier picture than the six-year comparison," so that the omission of the six-year figures could be a plausible basis for a jury finding of securities fraud. *Id.* (citation and quotation omitted).

A failure to disclose information to the public is only actionable if the defendants had a duty to disclose the withheld information. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir.1996).

In general, the "mere possession of material nonpublic information does not create a duty to disclose it." *Id.* The difficulty is that the "task of deciding whether particular information is subject to mandatory disclosure is not easily separable from normative judgments about the kinds of information that the securities laws *should* require to be disclosed, which depend, in essence, on conceptions of materiality." *Id.* at 1202–03 (emphasis in original). In other words, a duty to disclose will arise when, as outlined above, omission of the information creates a materially false impression of the company's well-being. *See Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996) (a duty "may arise if, *inter alia,* a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information."). In the end, the central question remains whether disclosure of the information would have had a significant effect on the decisions of a reasonable shareholder.

■ The plaintiffs base here their action on a "fraud-on-the-market" theory. The premise of this theory is that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir. 1986)). In such a market, misleading statements disseminated to the public "defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic,* 485 U.S. at 242, 108 S.Ct. 978. This is because the "market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *Id.* at 244, 108 S.Ct. 978 (quoting *In re LTV Sec. Litig.,* 88 F.R.D. 134, 143 (N.D.Tex.1980)). By

relying on this theory, the plaintiffs do not need to show that they directly relied on the alleged misrepresentations by the defendants when they bought, sold, or held GCX stock. Instead, they seek to establish that the defendants artificially inflated the price of GCX's stock by presenting the market with a falsely optimistic picture of the company's prospects. One consequence of this argument is that the alleged omissions of fact must be considered in the context of the publically available information, since most publically available information is reflected in market price. *Basic,* 485 U.S. at 247, 108 S.Ct. 978.

With these legal principles in mind, the plaintiffs' several allegations of fraud will be examined in turn.

### 2. *The Alleged Omissions*

#### a. The Guaranty of the South American Joint Venture's Debt

■ There is no question that the Company disclosed the fact that it had guaranteed 50% of the debt of the South American joint venture. The plaintiffs claim, however, that the defendants omitted to disclose that the filing of the bankruptcy constituted an event of default under the guaranty and that consequently the Company had incurred a current liability of $24.5 million.

In the first place, it would not be a material omission to fail to point out to the market that a bankruptcy filing constitutes an event of default under guaranty obligations. It is widely known, and surely known to the securities market, that it is a standard provision in loan agreements and the like to declare a bankruptcy filing by the obligor to be an event of default permitting the acceleration and calling of the obligation. The plaintiffs in their brief acknowledge their own familiarity with this "standard" practice. *See* Pls.' Opp'n at 12.

The federal securities laws do not require the defendants to state the obvious. *See In Re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 377 (3d Cir.1993) ("defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast."); *In Re Boston Tech., Inc., Sec. Litig.,* 8 F.Supp.2d 43, 61 (D.Mass. 1998) (where company disclosed that largest customer began "trial" of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word "trial"). *Cf. In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, at 374–76 (S.D.N.Y. 2003) (defendants' failure to disclose conflict of interest immaterial because market was aware of conflict from other sources).

Moreover, as the defendants contend, the existence of an event of default permitting a creditor to accelerate the obligation and demand its payment is not equivalent to an actual current default. The guaranty, consistent with standard practice, required the creditor to "call" the loan or guaranty in order to make it immediately due. According to public information disclosed in GCX's 10–Q for the quarter ended January 31, 2002, the Company's guaranty of the South American joint venture's debt was not called until after the conclusion of the class period. Thus, though the guaranty was vulnerable to being declared in default, because an event of default had occurred, it appears from information in the public record, not contradicted by any allegation by the plaintiffs, that the guaranty was not actually in default at the time the 2000 10–K was filed, and there was no obligation for the defendants to say what was not then true in that document.[2]

### b. The Mexican Note

■ The plaintiffs also allege that the defendants misled the market by reporting that the sale of a Mexican theater investment resulted in what was effectively a $6.8 million receivable. In its 2000 10–K, GCX reported that it had "sold its Mexican theatre investment for approximately $14.3 million of which $7.5 million of the sales price was received in cash, and the remaining balance will be paid in three installments over two years." Pls.' Ex. E at 6. The plaintiffs allege that by referring to the $6.8 million note as an asset in the 2000 10–K, the market was led to believe that this sum would be available to satisfy GCX's debts in bankruptcy. However, according to the plaintiffs this perception was incorrect because the $6.8 million were actually payable to GC International, a subsidiary of GCX which had not declared bankruptcy.

The allegation is fatuous. The 2000 10–K presented consolidated financial information, meaning that it reported GCX's assets as well as those of its subsidiaries as a group. Furthermore, the fact that the $6.8 million was owed to a subsidiary did not place it beyond the reach of GCX's creditors in the bankruptcy. Since the receivable was part of GCX's consolidated estate, it would have been available to satisfy creditors' claims.

**2.** Plaintiffs' contention that SEC Regulations S–X, 17 C.F.R. § 210.4–08(c), and S–K, 17 C.F.R. § 229.303, mandated disclosure of the existence of an event of default under the guaranty is similarly not availing. *See* Pls.' Opp'n at 31–34. Whether the regulations required a disclosure under these facts is not clear. Nevertheless, any omission of the existence of an event of default by the defendants was not materially misleading, in violation of generally accepted accounting principles, or accompanied by the requisite scienter. *See* discussion, *infra,* Part C, at 16–19.

Moreover, it appears that the amount due was paid to the Company during the pendency of the bankruptcy, and it thus became part of the bankruptcy estate, making the plaintiffs' allegation incorrect as a matter of fact. According to the Company's 10–Q for the quarter ended April 30, 2001, "In May 2001, the Company received $6.4 million as payment in full on its Mexican note receivable." App. to Def. Smith's Mem., Ex. E at original page 10.

### c. The Synthetic Leases

■ The plaintiffs' third allegation is that the defendants failed to disclose that GCX was a party to synthetic leases with two principal sources of capital financing, that the bankruptcy filing was an event of default under the leases, and that the bankruptcy filing thus gave rise to over $100 million in undisclosed, pre-petition claims by the lessors.

One commentator has described synthetic leases as follows:

> Under a synthetic lease, a capital source provides the funding for the construction or acquisition of real estate to be used by and leased to a corporate user. The capital source directly acquires the real estate from the developer and leases the real estate to the corporate user. After a five-year term, the user typically purchases the real estate from the capital source for a predetermined price.
>
> By complying with current federal income tax and financial accounting rules, companies can structure a synthetic lease to qualify as an operating lease for financial accounting purposes, but as a financing transaction for federal tax purposes. This structure offers many benefits, including off-balance sheet treatment of the transaction . . . .

Peter Nesvold, *What Are You Trying to Hide? Synthetic Leases, Financial Disclosure, and the Information Mosaic,* 4 Stan. J.L. Bus. & Fin. 83, 85–86 (1999). *See also* John C. Murray, *Off–Balance–Sheet Financing: Synthetic Leases,* 32 Real Prop. Prob. & Tr. J. 193, 194–96 (1997) (describing synthetic leases in greater detail). Through carefully structuring its real estate transactions with its capital sources, GCX could legitimately treat the transaction as an operating lease under accepted financial accounting rules.[3] Although some scholars have argued for a change in current reporting requirements that would make the "synthetic" quality of the leases more apparent to shareholders, *see e.g.,* Nesvold, *supra* p. 12, at 108–13, under the principles generally accepted at the time, GCX's use of this widely used practice was not fraudulent.

In any event, the Company did disclose the fact and amount of the leases. In its 2000 10–K, GCX reported that:

> The Company has entered into $118.8 million of operating leases with a major financial institution under a lease financing arrangement. The receivable due from the financing institution at October 31, 1999 of $15.5 million was reclassified to capital expenditures in 2000. The Company has Bankruptcy Court approval to make monthly adequate protection payments of approximately $1.1 million, in respect of the lease financing arrangement.

Pls.' Ex. E at 50. This statement puts a reasonable investor on notice of the nature of the GCX's lease arrangement. The statement also alerts shareholders that while GCX was operating as a debtor-in-possession, it would be servicing this real

---

**3.** There is no allegation of any violation of generally accepted accounting principles in respect of the synthetic leases.

estate lease under the supervision of the Bankruptcy Court.

The plaintiffs' additional argument that GCX should have reported the full amount of the lease obligations as a current liability as of the date of the commencement of the bankruptcy fails for the same reason as the claim that the full amount of the joint venture guaranty should have been reported as a current liability. While the leases may have been vulnerable to being accelerated, they were not. On the contrary, as reported, monthly payments made with the approval of the bankruptcy court were apparently staving off the acceleration of the full amount that might be due under the leases.

### 3. *The October 11, 2000 Press Release*

■ The complaint appears to allege that the press release that announced the bankruptcy filing was actionably deceptive, although the plaintiffs' briefs focus more on what the 10–K omitted to state. To the extent the plaintiffs seek to rely on the press release, their claims are without merit.

The press release presented two kinds of information. It gave some factual information: that the Company had filed for bankruptcy and what it would report as its assets and liabilities as of August 31, 2000. None of this information is alleged to have been false. The plaintiffs appear to allege that the defendants should have "updated" the August 31 figures in light of the bankruptcy, but there was no obligation for them to do so. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994); *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 10 (1st Cir.1991). *See also, Shaw*, 82 F.3d at 1219 n. 33.

The other information conveyed by the press release concerned what the Company hoped would be the outcome of the bankruptcy. These statements about what Company's management "expect[ed] to be able" to achieve in the bankruptcy were clearly "forward-looking statements," identified as such in compliance with the PSLRA. Even apart from the statutory safe harbor, they were the kinds of optimistic statements that the market "would easily recognize as nothing more than a kind of self-directed corporate puffery" and thus not actionable. *See Shaw*, 82 F.3d at 1218.

### 4. *The Uncertainty of the Outcome of Bankruptcy*

The plaintiffs bought their shares in GCX after it had entered bankruptcy and thus undertook to expose their investments to risks of a kind beyond those usually assumed by shareholders in public companies. An investor buying shares in a non-bankrupt company can evaluate the risk of the investment by considering the company's business environment and its historical record at performing in that environment. Honest and complete presentation of information pertinent to these issues are required by the securities laws.

An investor in a company in bankruptcy necessarily accepts additional risks of a different kind. The future value of the stock will be determined not simply by management's skill at devising and pursuing a business plan that will permit the company to sells its goods or services at an acceptable profit in a competitive marketplace. Two additional factors can be expected to have a profound influence on the course of the company's future and thus its value: the adversary interests of assembled creditors and the overarching independent judgment of the supervising court. The company's future will be negotiated not simply in the conventional bilateral relationship of management and marketplace, but in a new multilateral way with

new participants at the table. Understanding historical performance data and management's skill at and plans for running the business in coming periods can be very helpful in assessing the plausible outcomes of the two-way process, company-in-marketplace. That information, though it is of course not to be ignored, is not nearly as helpful, however, in assessing how the other factors will affect things. The outcomes of the processes of compromise and adjudication that occur in bankruptcy cases simply cannot be reliably predicted only on the basis of even completely accurate and fulsome financial statements. The risks are of a different order. Here, the plaintiffs cautioned that their financial statements were reported on a "going-concern" basis and did not attempt to account for what might happen in the bankruptcy case.

Indeed, under such circumstances, the market is far more likely to monitor the information to be gleaned from filings made in the bankruptcy case than to focus narrowly on the standard SEC filings and related disclosures. The plaintiffs here ignore the bankruptcy record, probably because to acknowledge it would be to bring such additional information to bear as to demonstrate the lack of merit of their claims.

## C. *Scienter*

As a separate ground for granting the defendants' motions, I conclude that the plaintiffs' complaint does not adequately allege facts permitting a strong inference that the defendants acted with scienter. *See* 15 U.S.C. § 78u–4(b)(2). The requisite state of mind is that the defendants acted with the "intent to deceive, manipulate or defraud." *Greebel*, 194 F.3d at 194. A plaintiff "may combine various facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity—to satisfy the scienter requirement. However, 'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." *In re Cabletron*, 311 F.3d at 39 (citations and quotations omitted).

The PSLRA did not alter the substantive definition of scienter as set forth in prior securities fraud case law. *See Greebel*, 194 F.3d at 200. The pre-PSLRA case law established that scienter includes certain kinds of recklessness. Reckless behavior can render a defendant liable for securities fraud if the defendant's conduct constitutes:

a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Id.* at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). This standard for recklessness "does not encompass ordinary negligence and is closer to a lesser form of intent." *Greebel*, 194 F.3d at 199.

The complaint does not set forth sufficient facts to raise the required strong inference of scienter. The complaint does not make separate allegations for each defendant. Instead, the complaint sets forth generalized allegations of knowledge which rest heavily on the defendants' roles or stations within the company. The portion of the complaint that addresses the defendants' intent alleges:

54. The purpose and effect of the defendants' plan, scheme and course of conduct was artificially to inflate and maintain the market price of GCX's common stock, and to foster the false

impression that GCX was a viable company with substantial equity.

55. Defendants Smith and Edwards, as senior officers and/or directors of GCX, and defendants Read and Sutherby, as directors of GCX and members of the special committee that engaged in a study of the financial condition of GCX and the alternatives available to it, including bankruptcy, were direct participants in the acts complained of herein. They had actual knowledge of their material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in failing to ascertain and disclose the true facts in the statements made to the SEC, Plaintiffs and other members of the Class.

56. Defendants each know and/or recklessly disregarded the falsity of the foregoing statements. As senior officers and/or directors of the Company, defendants were direct participants in the acts complained of herein and had access to the non-public information detailed above, by virtue of their receipt of periodic internal reports and other financial information.

Compl. ¶¶ 54–56. The plaintiffs' evidence of scienter is simply that the defendants were in a position to know the allegedly omitted facts and that they were in a position to approve of any financial statements issued by the company.

The complaint's allegations are insufficient because "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Greebel*, 194 F.3d at 197. The plaintiffs needed to allege "some additional misconduct" to survive the defendants' motion to dismiss. *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir.2001). Examples of such misconduct include: "insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest." *Id.* The plaintiffs have not alleged any additional misconduct of this nature. Instead, the plaintiffs simply stress that all three of the defendants were in positions of authority and possessed insider knowledge. This, by itself, is not enough. *See also Carney v. Cambridge Tech. Partners, Inc.*, 135 F.Supp.2d 235, 255 (D.Mass. 2001) ("This kind of pleading, attributing knowledge to a defendant merely because of the defendant's status in a corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter.").

The fact that GCX successfully petitioned the NYSE to continue listing its stock during bankruptcy also does not satisfy the needed extra allegation of misconduct. The complaint offers no reason to believe that GCX's petition to the NYSE was not made with a good faith belief at the time that the company would emerge successfully from the bankruptcy. The fact that the eventual outcome was different does not permit an inference that the originally expressed optimism was fraudulent.

The plaintiff's argument that the defendants are liable because they "knew or should have known" of the alleged omissions misapprehends the high standard for scienter the First Circuit imposes on securities fraud cases. Pls.' Opp'n at 36, 38, 39. As noted above, allegations of ordi-

nary negligence are inadequate. *See generally, Greebel,* 194 F.3d at 185 (explaining that although older case law uses the phrase "known or should have known," these cases did not broaden the scienter requirement to encompass negligence). Other than evidence of actual intent to deceive, only "an extreme departure from the standards of ordinary care" will meet the scienter requirement. *Id.* at 198. The complaint in this case does not allege such reckless behavior.

D. *Conclusion*

The plaintiffs' complaint fails on two independent grounds. First, the plaintiffs have failed to meet their obligation to allege that there was a material omission of information from any of the public statements GCX made immediately prior and during its bankruptcy proceedings. Second, the complaint does not adequately allege that the defendants acted with the requisite scienter. Accordingly, the defendants' motions to dismiss (docket nos. 21, 24, 26) are GRANTED. Judgment shall enter dismissing the complaint with prejudice.

It is SO ORDERED.