# United States Court of Appeals
## For the First Circuit

No. 03-2440

JOHN BARON; ALAN LAITES; AND THE
JEWISH FOUNDATION FOR EDUCATION OF WOMEN,

Plaintiffs, Appellants,

v.

RICHARD A. SMITH; PETER C. READ;
FRANCIS E. SUTHERBY; AND G. GAIL EDWARDS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Torruella, Circuit Judge,
Gibson,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.

John F. Harnes, with whom Harnes Keller LLP and Joan T. Harnes
were on brief, for appellants.
Gus P. Coldebella, with whom Goodwin Procter LLP and Stuart M.
Glass were on brief, for appellees Peter C. Read, Francis E.
Sutherby, and G. Gail Edwards.
Richard J. Rosensweig, with whom Goulston & Storrs, P.C. and
Thomas J. Sartory were on brief, for appellee Richard A. Smith.

August 18, 2004

---

[*]   Hon. John R. Gibson, of the Eighth Circuit, sitting by
designation.

**TORRUELLA**, **Circuit Judge**. Plaintiffs-appellants John Baron, Alan Laites, and the Jewish Foundation for Education of Women ("plaintiffs") appeal the district court's grant of a motion to dismiss their class action complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and failure to plead fraud with particularity under Fed. R. Civ. P. 9(b). For the reasons stated below, we affirm.

## I. Facts

Plaintiffs filed a class action complaint on behalf of purchasers of the stock of GC Companies ("GCX") for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as amended by the Private Securities Litigation Reform Act of 1994 ("PSLRA"), 15 U.S.C. §§ 78u-4-78u-5, and rules promulgated thereunder.

We review de novo, mindful that "the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002)(citing Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999)). We first sketch out the relevant facts as pleaded in plaintiffs' complaint and complemented by the district court's memorandum and order. Baron v. Smith, 285 F. Supp. 2d 96 (D. Mass. 2003).

-2-

GCX was a Delaware corporation that publicly traded on the New York Stock Exchange ("NYSE"). Defendants-appellees Richard A. Smith, Peter C. Read, Francis E. Sutherby, and G. Gail Edwards ("defendants") were all former officers and directors of GCX during the relevant class period.[1] GCX was in the movie theater business in the United States and South America and also managed an investment capital portfolio. GCX was the parent company of several wholly-owned subsidiaries, through which it conducted its business operations.

After several years of disappointing financial results, and faced with market saturation, GCX filed for Chapter 11 bankruptcy protection on October 11, 2000; some of its subsidiaries filed for Chapter 7 liquidation. A press release, which will be outlined in detail below, accompanied the bankruptcy filing. In the press release GCX described its hopes of emerging from bankruptcy reorganization revitalized and better structured to compete. This turn of events was not wholly unexpected as the company had stated in its September 13, 2000 Quarterly Report ("the September 2000 10-Q") that "[GCX] is actively considering all of its strategic alternatives, including additional closing of unprofitable units, sales of certain of the company's assets, or a

---

[1] The term class period is used, though the class was never certified.

potential bankruptcy restructuring, recapitalization, or bankruptcy reorganization . . . ."

In January 2001, GCX filed its Annual Report for 2000 ("2000 Form 10-K") which will be reviewed in detail below. That filing, like the press release, anticipated that GCX would emerge from reorganization in a stronger position. Contrary to GCX's expectations, however, the negotiations between management and creditors did not go well and, on June 13, 2001, GCX announced that it had signed a letter of intent with certain buyers who would purchase all of GCX's stock. Under the terms of the letter of intent, current shareholders would only receive payment if the liquidation of the investment portfolio yielded more than $90 million. During the class period, the stock traded at between $1.60 and $3.25 per share. After the announcement on June 13, 2001, which marks the end of the class period, GCX's stock price dropped to $0.25 a share.

## II. **Analysis**

The central issue in this appeal is whether the plaintiffs' complaint states a cause of action for material omissions under Section 10(b) of the Securities Act. We conclude that it does not.

To state a claim under Section 10(b) of the Securities Act, a plaintiff must allege, inter alia, that a defendant "(A) made an untrue statement of a material fact; or (B) omitted to

-4-

state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. § 78u-4(b)(1)(A)-(B).

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, makes it unlawful for any person,

> (a) [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Id.  We evaluate the allegations in the complaint with both proscriptions in mind.

Plaintiffs concede that defendants have not engaged in material misstatements; thus, to state a claim for securities fraud, they rely on the material omissions prong of § 78u-4(b)(1). Under the PSLRA, a complaint must identify what plaintiffs believe to be the material omission and why that omission is material.  Id. § 78u-4(b)(1)(B).  The test for materiality, taken from the pre-PSLRA case of Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988), was recently summarized as follows:

> A fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Information which would have assumed actual

-5-

> significance in the deliberations of a reasonable shareholder is material. In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. Thus, we review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality.

Bielski v. Cabletron Sys., Inc. (In re Cabletron Sys., Inc.), 311 F.3d 11, 34 (1st Cir. 2002)(quoting Basic, 485 U.S. at 231-32)(internal citations and quotation marks omitted).

The complaint focuses on certain GCX financial arrangements as well as the press release. Plaintiffs allege that defendants omitted material facts from GCX financial disclosure statements. We discuss each in turn.

## A.  The Press Release

The press release issued by GCX on October 11, 2000 contained the following information:

> GC Companies, Inc. (NYSE: GCX), parent company of General Cinema Theaters, Inc., announced today that GC Companies and certain of its domestic subsidiaries, including General Cinema Theaters, Inc., are filing voluntary petitions to reorganize their business under Chapter 11 of the U.S. Bankruptcy Code. The Company further stated that certain of its subsidiaries in Florida, Georgia, Louisiana, and Tennessee are filing Chapter 7 liquidation proceedings. The filings were made in the United States Bankruptcy Court for the District of Delaware. In its filings, [GCX] will report total assets of $328.9 million and total liabilities of $195.1 million as of August 31, 2000.

The Company believes that Chapter 11 reorganization provides the Company with the most effective means to terminate and restructure unprofitable leases and position the Company to succeed in today's highly competitive market.

. . . .

Through the Chapter 11 process, the Company expects to be able to terminate unprofitable leases, reduce the Company's operating expenses and make necessary improvements to the business to create a strong competitive future for [GCX]. While the Company completes the restructuring, its operations are expected to continue.

. . . .

The Company is arranging up to $45 million of debtor in possession financing to provide the Company with resources to fund its operations during the Chapter 11 proceedings.

After announcing a management restructuring which included the named defendants in this action, the press release ended with the following:

Forward-Looking Statements in this press release are made pursuant to the safe harbor provisions of the [PSLRA] of 1995. The words 'expect,' 'anticipate,' 'intend,' 'plan,' 'believe,' 'seek,' 'estimate' and similar expressions are intended to identify such forward-looking statements; however this press release also contains other forward-looking statements. [GCX] cautions that there are various important factors that could cause actual results to differ materially from those indicated in the forward-looking statements . . . . Among [them] . . . are: the overall viability of the Company's long-term operational reorganization and financial restructuring plan; . . . .

To the extent that plaintiffs seek to state a claim under the securities laws for a deceptive press release or as an

indication that the company omitted material information from its filings, we agree with the district court that the press release contained forward-looking statements, as so stated therein, and therefore comes under the protection of the statutory safe harbor. See 15 U.S.C. § 78u-5(c)(1);[2] see also Greebel 194 F.3d at 201 (discussing the safe harbor for forward-looking statements); Suna v. Bailey Corp., 107 F.3d 64, 70 (1st Cir. 1997)(stating, in a pre-PSLRA case, that "no reasonable investor would have read these statements, especially as they are accompanied by cautionary language, as promises or guarantees of future performance."). Thus, none of the statements made by GCX in the press release, which plaintiffs seek to attribute to the defendants, are actionable under Section 10(b) or Rule 10b-5. We therefore affirm

---

[2] This section states:

> Except as provided in subsection (b), in any private action arising under this title that is based on an . . . omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that --
> (A) the forward-looking statement is --
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> (ii) immaterial; . . . .

15 U.S.C. § 78u-5(c)(1).

the district court's dismissal of the claims based on the press release.

## B.   The Synthetic Leases

Plaintiffs devote a considerable portion of their efforts in constructing a claim under Section 10(b) and Rule 10b-5 to GCX's use of synthetic leases as a corporate finance tool and GCX's description of the leases in its financial disclosure filings.  GCX entered into two synthetic leases before filing for bankruptcy. Plaintiffs argue that GCX omitted material information from its public filings regarding these synthetic leases which was necessary for the disclosed information not to mislead investors.

A synthetic lease is an arrangement that allows a corporation to finance real estate ownership while shifting the risk away from itself should the deal prove unprofitable.  "A primary factor motivating many synthetic leases is the off-balance sheet treatment that such transactions receive." H. Peter Nesvold, What Are You Trying to Hide? Synthetic Leases, Financial Disclosure and the Information Mosaic, Stan. J. L., Bus. & Fin. 83, 93 (1999). Overall, the off-balance treatment gives the corporation the opportunity to show a stronger bottom line in its financial disclosure statements.  Id.  Other financing advantages, such as tax savings, can also make synthetic leases a good vehicle for corporate financing.

The first synthetic lease at issue here was with General Electric Credit Company ("the GECC lease") and the second was with Heller ("the Heller lease"). The district court held that GCX disclosed the existence and the amount of the leases in its 2000 Form 10-K, and that "a reasonable investor [would have been] on notice of the nature of GCX's lease arrangement." Baron, 285 F. Supp. 2d at 105.

The 2000 Form 10-K contained the following information regarding the leases:

> [GCX] has entered into $118.8 million of operating leases with a major financial institution under a lease financing arrangement. The receivable due from the financing institution at October 31, 1999 [sic] of $15.5 million was reclassified to capital expenditures in 2000. [GCX] has Bankruptcy Court approval to make monthly adequate protection payments of approximately $1.1 million, in respect [sic] of the lease financing arrangement.

Plaintiffs argue that this information is not sufficient to meet defendants' disclosure requirements.[3] They allege, inter alia, that more information was necessary to inform investors of the

---

[3] To the extent that plaintiffs relied on the language in the press release to bolster its claim that GCX violated Section 10(b) and Rule 10b-5, that information is not considered probative of alleged omissions, as they are protected by the statutory safe harbor unless the person making the forward-looking statements, in this case GCX, had actual knowledge they were false or misleading. See 15 U.S.C. § 78u-15(c)(1)(B); see also Greebel, 194 F.3d at 201. Plaintiffs have made no allegation that defendants had actual knowledge the statements regarding GCX freeing itself from the operating leases in bankruptcy were actually false or misleading.

consequences of the leases and that GCX's failure to disclose the subsequent claims that came into being once they filed for bankruptcy constituted a violation of Section 10(b) and Rule 10b-5.

Plaintiffs' claim fails because GCX disclosed the material facts that would lead a reasonable investor to make an informed decision regarding the purchase of stock in GCX. We review allegations of securities fraud under the particular facts of each case. See Greebel, 194 F.3d at 196. First, during the relevant class period, the company was in reorganization proceedings. Thus, any reasonable investor was aware that the business operations of GCX were strained and the company was undergoing substantial changes in its operations. Upon evaluating the particular language of the 2000 Form 10-K regarding the leases, it is clear that the amount of the liability is disclosed as is the nature of the transaction and the accounting change over to capital expenditure. Second, and most important, GCX specified its continuing obligation, as well as the amount of the obligations, as a debtor-in-possession vis-à-vis the leases, during the relevant class period.[4] Cf. In re Cabletron, 311 F.3d at 35 (where company's revenues were materially inflated by tens of millions and

---

[4] Moreover, plaintiffs' claims that the leases were vulnerable to acceleration are unavailing. Most financial instruments are subject to some type of default or penalty if a party stops payment; in this case, however, the 2000 Form 10-K disclosed that GCX would continue to meet its obligations under the supervision of the bankruptcy court.

the inaccuracy in earnings was derived from actual fraud, filings were considered materially misleading).

Plaintiffs also allege, on a slightly different track, that one of the reasons the district court dismissed their claims regarding the synthetic leases was "because compliance with GAAP immunized defendants from liability." We do not believe the district court's holding is susceptible to such an interpretation. In fact, the district court stated that "[t]here is no allegation of any violation of generally accepted accounting principles in respect [to] the synthetic leases." Baron, 285 F. Supp. 2d at 105 n.3. We have previously observed that a violation of GAAP in SEC filings raises an inference that the disclosure is misleading or inaccurate under SEC regulations. See In re Cabletron, 311 F.3d at 34 (citing to 17 C.F.R. § 210.4-01(a)(1)). In the same vein we have held that even when a company's disclosure is in violation of GAAP, "some techniques . . . might prove to be entirely legitimate, depending on the specific facts." Id. In this case, plaintiffs concede that the SEC filings are in compliance with GAAP. Nevertheless, they argue that GAAP rules should not immunize the defendants from liability.[5] We think this misses the central

---

[5] Synthetic leases are treated as operating leases under GAAP. See generally Donald J. Weidner, Synthetic Leases: Structured Finance, Financial Accounting and Tax Ownership, 25 J. Corp. L. 445, 454-465 (providing an expanded overview of the relationship between financial accounting principles and synthetic leases). While there is some controversy over this treatment, there is no question that, under GAAP, the leases were properly reported.

question in this matter which is whether the leases were disclosed in compliance with Section 10(b).  All the material information necessary for a reasonable investor to make an informed decision was provided.

**C.  The Mexican Note**

According to plaintiffs, GCX represented in its filings that a $6.8 million note ("the Mexican note"), payable in connection with GCX's sale of its Mexican theater investment, was a GCX asset.

The existence of the Mexican note was disclosed in the 2000 Form 10-K.  It stated that "[i]n May 2000, [GCX] sold its Mexican theater investment for approximately $14.3 million of which $7.5 million of the sales price was received in cash, and the remaining balance will be paid in three installments over two years."  Plaintiffs argue that defendants were obligated to state that the Mexican note was owned by a subsidiary, not by GCX, and was therefore outside GCX's bankruptcy estate during Chapter 11 proceedings.

The district court characterized this claim as "fatuous." Baron, 285 F. Supp. 2d at 104.  We agree that plaintiffs' claim that the disclosure of the Mexican note in 2000 Form 10-K was in violation of Section 10(b) is a non-starter.  The 2000 Form 10-K for GCX was, by its terms, a consolidated return and included financial data for both the parent company and its subsidiaries, in

compliance with § 13 and § 15(d) of the Securities Exchange Act of 1934.  See 15 U.S.C. § 78m, § 78o(d); see also 17 C.F.R. § 210.3-01 (detailing the SEC regulations for consolidated balance sheets).

Plaintiffs allege that the possibility that the Mexican note would not be part of the bankruptcy estate is a material omission that should have been disclosed under the securities laws. As stated above, claims for securities fraud during the relevant class period should be evaluated in the context of GCX's bankruptcy filing.

Moreover, GCX's proceeds from the Mexican note were included in the bankruptcy estate, as is evident from GCX's bankruptcy filings and the quarterly report (Form 10-Q) for the quarter ending on April 30, 2001, which stated that "[GCX] received $6.4 million as payment in full on its Mexican note receivable."

We find that no material information that was necessary for a reasonable investor to determine GCX's financial condition was omitted with respect to the Mexican note.

D.  **The South American Joint Venture**

Plaintiffs allege that defendants omitted the fact that the filing of a bankruptcy petition was an event of default under a loan guarantee made for a South American joint venture. The loan guarantee by its terms involved a two-step process required to trigger GCX's obligations: first, an event of default had to occur and second, the loan guarantee had to be called.  Plaintiffs argue

-14-

that GCX's failure to disclose that the Chapter 11 petition was an event of default in the 2000 Form 10-K constitutes a material omission.

We agree with the district court that "there is no question that [GCX] disclosed the fact that it had guaranteed 50% of the debt of the South American joint venture." Baron, 285 F. Supp. 2d at 103. The 2000 Form 10-K also disclosed the current status of the joint venture as well as the amount of GCX's guarantee obligations.

Plaintiffs admit that the default as to the South American joint venture was not a current default during the relevant class period. They argue, however, that the failure to disclose the effect of the bankruptcy filing on the joint venture was a material omission. We disagree. It is not a material omission to fail to point out information of which the market is already aware. See In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993)(no violation where investors were not informed of the weakened economic conditions in particular geographic areas). Plaintiffs admit that the filing of a voluntary petition for reorganization under Chapter 11 is considered a standard event of default for most guarantee obligations in the financial markets. In addition, as plaintiffs acknowledge, a default and an event of default are different things under the bankruptcy code. See generally U.S. Fid. & Guar. Co. v. Braspetro

-15-

<u>Oil Servcs. Co.</u>, 369 F.3d 34, 51 (2d Cir. 2004)(explaining that where failure to comply with contract clauses was event of default as specified in contract, the court must still examine whether there was actual default on performance).

Moreover, given the structure of the financial transaction, the event of default did not materially alter GCX's financial obligations. The loan still had to be called; the record makes clear that the company's obligations under the guarantee were not triggered until it was called in January 2002, more than six months after the end of the class period at issue in this case, and as disclosed in GCX's Quarterly Report (Form 10-Q) for the quarter ending January 31, 2002.[6]

**E. Pleading Fraud**

The district court dismissed the complaint on the alterative grounds that plaintiffs had failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b). <u>See</u>, <u>e.g.</u>, <u>Aldridge</u> v. <u>A.T. Cross Corp.</u>, 284 F.3d 72, 78-79 (1st Cir. 2002)(stating that a complaint must meet the PSLRA standard for pleading fraud). Because we find that the complaint failed to

---

[6]   Plaintiffs make somewhat oblique references to defendants' alleged violations of SEC Regulations S-K and S-X because of a failure to supplement certain information which appeared in prior financial documents. We find, as did the district court, <u>see</u> <u>Baron</u>, 285 F. Supp. 2d at 104 n.2, that plaintiffs' allegations as to the event of default were not actionable under the facts of this case.

plead any material omissions, we need not reach the issue of whether fraud was adequately pleaded.

## III. <u>Conclusion</u>

We therefore affirm the district court's dismissal of plaintiffs' complaint for failure to state a claim under Section 10(b) and Rule 10b-5 of the Securities Exchange Act.

**<u>Affirmed</u>**.